(No. 47088

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. EUTES WHITE, Appellant.

*Opinion filed September 26, 1975.*

Paul Bradley, First Deputy, Office of State Appellate
Defender, of Chicago (Margaret Maxwell, Assistant De-
fender, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield, and
Robert H. Rice, State's Attorney, of Belleville (James B.
Zagel, Jayne A. Carr, and Brian A. David, Assistant
Attorneys General, of counsel), for the People.

MR. JUSTICE SCHAEFER delivered the opinion of
the court:

The defendant, Eutes White, was found guilty of
murder, in the circuit court of St. Clair County, by a jury
which, acting under the authority of the statute then in
effect, recommended the death penalty. He was sentenced

by the judge to imprisonment for a term of not less than 199 nor more than 200 years. On appeal, the Appellate Court, Fifth District, rejected several of the grounds upon which the defendant attacked the judgment, but found that there was "no evidence in the record to indicate that the defendant was or was not given the required *Miranda* warnings prior to any questioning." The case was therefore remanded to the trial court for "a new full and complete hearing on the admissibility of the defendant's confession." 10 Ill. App. 3d 914 (1973).

Upon remand, a hearing was conducted. The trial court found that the confession was properly received in evidence, and entered a new judgment of conviction and a new indeterminate sentence in accordance with the Unified Code of Corrections. (Ill. Rev. Stat. 1973, ch. 38, par. 1001–1–1 *et seq.*) The defendant again appealed. On this appeal a majority of the appellate court held that the trial court did not err in finding that the defendant's oral and written statements were voluntary. (22 Ill. App. 3d 180 (1974).) One judge dissented, pointing out that the "record discloses that the defendant is a borderline retardate with an I.Q. of 76" who initially asked for an attorney but then "signed a confession after 3 days of questioning by the police." It was the opinion of the dissenting judge that the confession should have been excluded under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. We allowed leave to appeal. The only issue before us is the admissibility of the confession.

The defendant was arrested on the morning of May 24, 1969, for an unrelated offense. What then occurred is described in the testimony of Captain Johnson of the East St. Louis police force:

"State's Attorney: Q: To the best of your recollection what were the events that transpired at the time that you met Mr. White on that day?

A: It was brief. I advised him of his rights; I asked

him if he would care to talk about whatever the offense was at that time, and he said he didn't want to talk about it; he would rather see a lawyer.

Q: Was he given an opportunity at that time to make a telephone call?

A: Yes—I am not sure—although he was taken from the office there; he was in my office where he could have made a phone call.

Q: He understood then at that point he didn't have to say anything to anybody?

A: That is right.

Q: What was done with him after he said that he didn't wish to make any statement?

A: To my recollection he was placed back in the cell block.

A: Also he was asked if he understood it.

Q: To your knowledge did he express his understanding of that statement?

A: Yes, he said that he would rather see a lawyer.

Q: Do you know of your own knowledge whether he ever talked to a lawyer after that point?

A: No, I don't."

The significant portions of Captain Johnson's testimony on cross-examination are as follows:

"Q: So that you initially talked to him and gave him his rights, and gave him his rights [sic], and he said I don't choose to make a statement at this time; I would rather have a lawyer?

A: That is right.

Q: Then did you turn the matter over to detective Stannis [sic]?

A: That is right.

\* \* \*

Q: Are you quite certain he said that he wanted a lawyer or he didn't want to make a statement?

A: Yes, that is what he said; I didn't talk to him long.

\* \* \*

Q: Well, is it your testimony he was refused an opportunity to call someone of his choosing or to have someone appoint a lawyer for him?

A: He was refused?

Q: Yes.

A: No, I am not saying he was refused; I am saying one thing; I talked with him; he said that he would rather talk to a lawyer; he didn't want to talk, so then the conversation ceased.

Q: As we know, he was then returned to his cell, I assume?

A: Yes."

Then, after a recess, Captain Johnson was recalled by the prosecutor, and testified:

"Q: If someone asked for a lawyer is it the practice of your department to see that they are able to get a lawyer?

A: If he had asked for a lawyer I would have given him the phone there on my desk and let him use the phone.

Q: When you said that he wanted to speak to a lawyer, do you mean that he asked, that he wanted to retain a lawyer?

A: Well, I am not sure this is what the words that he said but he didn't want to talk, so therefore I had him put back in the cell block.

Q: Well, could it have been that you just assumed when you were seeing him that he wanted a lawyer, since he didn't want to talk?

A: Yes.

Q: If he had asked for a lawyer would Detective Stannis [*sic*] have been notified of that fact?

A: He would have been, yes.

Q: Would any questioning have proceeded before he was able to talk to one?

A: Not to my knowledge.

Q: This is important, I want to get this straight; did he specifically ask you and say, I want a lawyer; I want to talk to a lawyer?

A: No, he never asked me about he wanted to talk to a lawyer; he didn't want to talk to me, so I would assume that he would rather have a lawyer there present, but he didn't ask for one; if he had he would have used the phone there on my desk.

Q: Now, I know that a lot of what police officers testify to is based upon years of experience in a routine way of doing things; you say, had he asked for a lawyer, I would have let him use my phone; can you say specifi-

cally in this case that Eutes White didn't ask for a lawyer?
A: No, he didn't ask for a lawyer."

Thereafter, the defendant was turned over to Detective Stanis, who questioned him later on May 24 and also during the morning and afternoon of May 25 concerning unrelated offenses. On each of these three occasions, Detective Stanis testified, the *Miranda* warnings were read to the defendant, who said that he understood them. On the morning of May 25 the defendant signed a written confession to one unrelated offense, and on the afternoon of that day he signed another confession to another unrelated offense. On May 25 the defendant was also exhibited in a lineup and his palm print was taken.

At the original hearing on the motion to suppress the confession, Captain O'Sullivan testified that the defendant was advised of his constitutional rights by Detective Stanis, who read "the rights" to him from a card. Captain O'Sullivan was asked:

"Q: Do you recall at this time what was stated in advising this defendant of his rights by your partner?

A: He was advised ... What was in the card, you mean. He had a right to remain silent. The gist of it was he could have an attorney if he so needed. What he said could and would be used against him.

Q: Was he also advised if he could not afford an attorney, one would be furnished?

A: Yes. He could have one, yes. That is what I said.

\* \* \*

Q: What did he say when you told him he had the right to have an attorney present at the time of this statement?

A: He said he didn't need one."

At that hearing Detective Stanis testified that he "read from a card furnished our Department from the State's Attorney, advising the subject of his rights." The direct examination continued:

"Q: Did you advise him he had the right to have an attorney?

A: Yes sir.

Q: What did he say to that? Did he want an attorney?

A: To be truthful, I can't say exactly what his answer was on that. I don't remember.

Q: Did he tell you he wanted an attorney?

A: No, he did not state he wanted an attorney.

Q: Did you tell him if he did and couldn't afford one, he would be furnished an attorney?

A: Yes, sir.

Q: After you advised him of his right to remain silent, did he state he would talk to you and wanted to give you a statement?

A: He stated he would talk with us.

Q: He did not refuse to talk to you?

A: No, sir."

On cross-examination of Detective Stanis, the following occurred:

"Q: You said, you seemed to be a little concerned about your answer as to what he said when he was advised of his right to have an attorney before making any statement. You are saying you don't remember what he said. You are pretty sure he didn't or you think he didn't say he wanted one. Could you be more explicit as to what the conversation was?

A: When each point was read to him he was asked if he understood and he said yes. That was one of the points read. He understood it. And he made no comment if he wanted a lawyer."

In our opinion the record establishes that in his interrogation by Captain Johnson, the defendant stated that he desired counsel and did not desire to talk. Captain Johnson's initial testimony on this point was unequivocal, both on direct examination by the prosecutor and on cross-examination by counsel for the defendant. It was only after he was recalled by the prosecution after a recess that his testimony became equivocal and he began to refer to the "practice of the department" and the like. We are unable, therefore, to agree with the view of the majority of the appellate court that "Since the defendant failed to proffer any evidence to contradict Captain Johnson, the

trial court could, in its discretion, accept Johnson's testimony as true ***." (22 Ill. App. 3d 180, 184.) In our opinion Johnson's testimony unmistakably establishes that the defendant requested counsel. The defendant testified that he did not remember any of the interrogations or the signing of the confession.

The record is not clear as to whether or not Detective Stanis was advised that the defendant had told Captain Johnson that he wanted to talk to an attorney. But that is not significant because the notice given to Johnson is imputed to him. "To hold otherwise could make it possible to nullify an accused's request for the assistance of counsel by the expedient of transferring his custody for questioning to an officer who would be unaware of the request for an attorney." *People v. Blanchard* (1967), 37 Ill.2d 69, 73.

The defendant's contention that his confession was erroneously admitted in evidence is based upon *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. In *Miranda* the court stated:

"*** If [the accused] indicates in any manner at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." 384 U.S. 436, 444-45.

"*** the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege." 384 U.S. 436, 469.

"*** If the individual states he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. 436, 474.

The *Miranda* warnings are prophylactic measures designed to guard against infringement of the privilege against self-incrimination. The emphasis upon the right of a suspect to have counsel during custodial interrogation, if he so desires, would seem to be closely associated with the sixth amendment right to counsel which was involved in

*Escobedo v. Illinois* (1964), 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758. From the outset, however, there has been disagreement with what would appear to have been the implicit holding in *Miranda* that the right to counsel attached prior to the making of a formal charge against a defendant. Indeed, dissent from that view appeared in *Escobedo* itself. (See the dissenting opinion of Mr. Justice White, 378 U.S. 478, 495.) Further doubt that there is a sixth amendment constitutional right to counsel before a suspect has been charged with an offense stems from *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877. There the court refused to accord to an unindicted suspect the right to have counsel present during a lineup—a right which *United States v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, and *Gilbert v. California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951, had accorded persons who had been formally charged with an offense. And there the statement that *Escobedo* was to be limited to its own facts was repeated. 406 U.S. 682, 689; see also *Michigan v. Tucker* (1974), 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357.

We therefore consider the case as presenting a violation of the procedural safeguards announced in *Miranda v. Arizona,* and not as involving an infringement of the defendant's constitutional right to counsel. Thus the question presented is whether the record shows circumstances that neutralize the effect of the *Miranda* violation.

In *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, the court considered a somewhat similar question: the extent to which *Miranda* warnings might neutralize a prior illegal arrest so that a subsequent inculpatory statement of the defendant might be received in evidence against him. Because the incentive to comply with *Miranda* would be substantially weakened if subsequent warnings were made a cure-all, the court concluded that *Miranda* warnings alone and *per se* will not always break the causal connection between the illegality and the

confession. As applied to the case before us, the opinion in *Brown* indicates that repeated *Miranda* warnings do not of themselves dilute the effect of an initial violation.

In the case before us the interrogation that produced the confession did not immediately follow the defendant's request for an attorney. It thus differs from *People v. Henenberg* (1973), 55 Ill.2d 5. (See also *People v. Turner* (1973), 56 Ill.2d 201.) The confession in this case was not given until May 26. The defendant had been arrested on the morning of May 24, and it was then that he had said that he would prefer to speak to an attorney before talking to Captain Johnson. At that time interrogation ceased. On the afternoon of the 24th he was again given *Miranda* warnings and was questioned by Detective Stanis about other offenses. Either on that date or on May 25 he participated in a lineup and his palm print was taken. On May 25 he was not questioned at all concerning the offense involved in this case, but he was interrogated during that morning with respect to an unrelated offense to which he confessed. In connection with that interrogation he was given the full *Miranda* warnings. During the afternoon of the 25th he was interrogated with respect to still another offense, also unrelated. Again that questioning was preceded by *Miranda* warnings which Detective Stanis testified the defendant understood. Thereafter he signed a confession with respect to that offense.

There was no questioning with respect to the offense here involved until May 26. In the morning of that day, after having again been given full *Miranda* warnings, the defendant signed the confession involved in this case.

What we have, then, is a *Miranda* violation which resulted from the failure of the police department to furnish the defendant a lawyer when he said he wanted to talk to one. The reason for this failure is not altogether clear, although the testimony of the officers suggests that they felt under no obligation to take any steps toward furnishing an attorney unless the defendant named a

specific attorney to whom he wished to talk. The defendant testified at the trial that he had only a vague recollection that he had been held at the police station for some days about the time that his confession was obtained; he had no recollection of being interrogated or of signing any confessions.

The situation is not an easy one to appraise. The defendant's I.Q. was low. On the other hand, there was testimony by the interrogating officer that he understood the *Miranda* "rights" when they were read to him. This was not the first time that the defendant had been charged with a crime, nor was May 24 the first time he had been given *Miranda* warnings. The impact upon the defendant of the lineup in which he participated, and of the taking of his palm print, is not apparent from the record before us, but there is no reason to believe that it would be favorable to the defendant. In this case there is no claim of police brutality. It is not suggested that the defendant's sleep was interfered with during the two nights that he was held in custody prior to his confession of the present crime.

The successive warnings in this case each concerned a separate offense, and the record shows that the officers proceeded in this way in order to obtain in each instance a confession that related to a single offense. Although the total period of interrogation was unduly prolonged, a number of very serious offenses were involved and the defendant was interrogated separately as to each offense.

While the case is a close one, we are of the opinion that the effect of the procedural violation of the *Miranda* standards was sufficiently dissipated by lapse of time, repeated admonitions and other intervening events so that the defendant's confession was voluntary and was therefore properly received in evidence.

The judgment of the Appellate Court, Fifth District, is therefore affirmed.

*Judgment affirmed.*