THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CARL E. GIBSON *et al.*, Defendants-Appellants.

Second District   No. 76-259

Opinion filed December 28, 1977.

930

Ralph Ruebner and Joshua Sachs, both of State Appellate Defender's Office, of Elgin, for appellants.

Jack Hoogasian, State's Attorney, of Waukegan (Phyllis J. Perko and Barbara A. Preiner, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE NASH delivered the opinion of the court:

Defendants, Carl E. Gibson and Marcus D. Jones, were found guilty after a joint jury trial of the offense of armed robbery and were sentenced, respectively, to terms of 8 to 12 and 10 to 15 years in the penitentiary. They both now appeal contending: (1) that their confessions were involuntary and the trial court erred in denying their motions to suppress them; and (2) that the trial court erroneously admitted prejudicial hearsay testimony at trial.

Shortly before midnight on September 14, 1975, three armed men entered Rygiel's Tavern in North Chicago, Illinois, and robbed a bartender and several patrons. On September 17, 1975, a Debra Davis was arrested in East St. Louis, Illinois, for attempting to use a credit card which had been stolen in the robbery and she told the East St. Louis police, who in turn informed the North Chicago police, that defendants, Jones and Gibson, were involved in that robbery. The defendants were arrested on September 18, 1975, in East St. Louis.

Defendants filed a motion to suppress tape recorded confessions which had been made jointly by them in police custody. At the hearing of the motion Sergeant Lawrence Brewer of the East St. Louis Police Department testified that on September 18, 1975, at 2:30 p.m. he and other officers, acting on the basis of a warrant issued in Lake County, Illinois, arrested defendant Carl Gibson at his place of employment in East St. Louis. Sergeant Brewer orally advised Gibson of his *Miranda* rights; defendant stated he understood them and was taken to the police station. There Gibson was again advised of his *Miranda* rights in writing and he signed a waiver of rights form at 2:47 p.m. Sergeant Brewer then questioned Gibson about the robbery in North Chicago and was told by him that he knew about it and that he and defendant Marcus Jones had been in North Chicago when it occurred and were involved in the robbery with a third person. Sergeant Brewer talked to defendant Gibson, for 20 to 30 minutes, but he declined to give a written statement and was placed in a cell. Brewer and another officer then went to an East St. Louis address given to them by Gibson and arrested defendant Jones between 5 and 5:25 p.m. Jones was then advised of his *Miranda* rights and

said that he understood them. At the police station the *Miranda* warnings were again read to Jones and he initialed each right listed on a waiver form, but refused to sign the form stating he did not wish to speak to the police. Jones was then placed in a cell without further attempts by the officers to question him at that time.

Detectives William Knox and Joseph Semasko of the North Chicago Police Department arrived at the East St. Louis police station at about 7:30 p.m. that evening. Defendant Gibson was brought from his cell to the detective bureau where Detective Knox, in the presence of Brewer, Semasko and another officer, advised Gibson again of his *Miranda* rights and informed him that any statement he made would be tape recorded. Gibson again stated he understood what his rights were and again signed a rights waiver form after being advised that in so doing he was not admitting to anything. Thereafter defendant Gibson was questioned about his earlier statement to Sergeant Brewer concerning his involvement in a robbery and he stated he did not wish to talk about it at that time but that he might later in North Chicago. The officers then advised defendant that Sergeant Brewer had told them about his earlier statement but he again stated he did not want to talk at that time. He was further asked whether his previous statement to Sergeant Brewer was true and he replied that it was.

At about 8:30 p.m. that evening defendant Jones was brought from his cell to the detective bureau where Detective Semasko, together with Brewer, Knox and another officer, again informed him of his *Miranda* rights and Jones signed a rights waiver form after being informed it was a statement of rights and not admissions by him. When the officers questioned him he stated again that he did not wish to discuss the robbery and was thereupon returned to his cell by Brewer. After leaving Jones' cell Sergeant Brewer went to Gibson's cell and asked him why he would not talk to the North Chicago police about the tavern robbery after he had already told Brewer about it. Gibson replied that "he probably would talk to them, but he wanted to wait."

The testimony of Detectives Semasko and Knox at the hearing of the motion to suppress defendants' confessions was similar to that of Sergeant Brewer regarding police contacts with defendants on September 18. The officers also testified that neither Gibson nor Jones made any requests for an attorney or to make a phone call to anyone else.

Detective Semasko testified further at the hearing that on the next morning, September 19, he and Knox set out to drive the defendants back to the North Chicago police station, a seven-hour trip. Defendants were again advised of their *Miranda* rights by the officers during the trip and the officers talked to them telling them of evidence the police already had and, in Semasko's words, "trying to get them to give us a statement

relative to this case." Neither defendant said anything inculpatory about the robbery during the trip, but defendant Gibson stated he would talk to the officers once they got to North Chicago. They arrived at the North Chicago police station at about 5 p.m. and Knox and Semasko then attempted again to speak to Gibson about the robbery. They advised him of his *Miranda* rights, which he stated he knew and understood, and he again signed a rights waiver form. He said that he would tell the officers about a robbery he had been involved in if defendant Jones was present. Defendant Jones was then brought to the room where the questioning was taking place, advised of his *Miranda* rights, which he stated he knew and understood, and he then again signed a rights waiver form.

The subsequent conversation, which was the subject of the motion to suppress, was recorded on tape and played back at the hearing. At the outset of the first tape recording, at about 5:37 p.m., defendant Gibson was advised of his *Miranda* rights on tape and there said again that he understood them and was speaking voluntarily without any promises having been made to him and knew that the conversation was being recorded. In response to questions by the detectives he stated that shortly before midnight on September 14, 1975, he entered a tavern in Waukegan or possibly North Chicago with John Booth and took some money from the cash register while a Barbara Upchurch waited outside in a car. He stated that Marcus Jones was not involved in the incident although he had seen him earlier that day in the North Chicago area. Detective Semasko testified that at this point there was a malfunction in the recorder and that a second tape was installed after some delay. The second tape commenced at about 6:35 p.m. and both defendants were again informed they were being recorded, again advised of their *Miranda* rights and they again stated they understood their rights, that they were being recorded and they they were giving their statements voluntarily without promises having been made to them.

Gibson thereupon stated that his previous statement regarding the robbery on the first tape was not correct. On questioning of Jones then, about his involvement in the robbery, he stated that he did want to talk to the officers but that it was kind of hard to do so. The officers assured him that he did not have to talk to them and Jones stated that he just needed a little time. A 10- or 12-minute break then occurred during which time coffee and something to eat was provided and Jones then related on the tape that he, John Booth and defendant Gibson had entered the tavern in question and taken money and property from the persons inside. Gibson also stated on that tape that he had participated in the robbery with Jones. The defendants were requested to confirm that they understood that they had the right to remain silent and to have an attorney present during questioning as indicated in the rights waiver forms each had signed.

Gibson stated he understood, but Jones said he had not understood he could have an attorney present during the questioning. Other statements made at this point of the recording by Jones are noted in the transcript as being unintelligible due to microphone noise and to a squeaking chair. In response thereafter to further inquiries by Officer Semasko, which were recorded, Jones stated he did understand all of his rights and had given the statement voluntarily. The tape recording session ended at 7:14 p.m.

The testimony of defendants Jones and Gibson at the suppression hearing varied in some respects from that of the officers. They each testified that they made repeated requests for an attorney both in East St. Louis and North Chicago and that they were refused permission to call either an attorney or their parents. Jones testified that while in the East St. Louis jail he had nothing to eat and only a cup of coffee on the morning of September 19 and that on the trip from East St. Louis the detectives told him to confess as they already had enough evidence to convict him and his fingerprints were found in the tavern. Jones further testified he did not understand the word "waiver" and both defendants testified they did not understand they had the right to have an attorney present during questioning. Jones further said that he was ill at the time of his arrest and Gibson stated that he made the recorded statements only because the police told him that if he did not do so other charges would be placed against him, but that they would "talk up" to the judge if he did, and also that he was confused because he had only slept three hours during the previous night due to adverse conditions in his cell. In rebuttal, Detective Knox testified that no threats or promises had been made to either defendant nor did they at any time request an attorney or to make a phone call. He testified they both appeared to be in good health and had registered no complaints.

Defendants' motion to suppress the confessions contained in the tape recordings was denied and they were introduced in evidence and played before the jury in the trial of the case.

Defendants argue that their confessions were involuntary because the police failed to scrupulously honor their right to remain silent. They assert that for more than 24 hours they persisted in their desire to remain silent but that repeated interrogation by the officers wore them down to the point where they involuntarily waived this right. Defendants refer to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, where the court stated: "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627.) They further refer to *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321, where the court, in discussing the right to custodial silence, stated that "the admissibility of statements

obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.' " 423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326.

■■ The fact that a defendant has exercised his right to remain silent by declining a request that he make a statement does not permanently preclude all future inquiries by officers to determine whether he has changed his mind. (*Michigan v. Mosley* (1975), 423 U.S. 96, 102-03, 46 L. Ed. 2d 313, 320-21, 96 S. Ct. 321, 326; see also *People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7; *People v. Morgan* (1976), 39 Ill. App. 3d 588, 596, 350 N.E.2d 27, 33.) What is clearly prohibited is continued interrogation after the defendant has chosen to remain silent (*Miranda v. Arizona*) and persisting in repeated efforts to wear down his resistance and cause him to change his mind. See *Michigan v. Mosley* (1975), 423 U.S. 96, 105-06, 46 L. Ed. 2d 313, 322, 96 S. Ct. 321, 327; *People v. Brookshaw* (1973), 12 Ill. App. 3d 221, 299 N.E.2d 20; *People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7.

■■ An examination of the evidence in this case demonstrates that on most of the several occasions defendants were questioned they had indicated a wish to remain silent and that their decision was honored by the officers; interrogation ceased and did not resume by any officers until a period of time had elapsed. It is also clear that on each of the several occasions that the officers sought to question them they were again advised of their *Miranda* rights. By doing so the officers were generally following a procedure described with approval in *Michigan v. Mosley* (423 U.S. 96, 106, 46 L. Ed. 2d 313, 322, 96 S. Ct. 321, 327; see also *People v. Goodrich* (1977), 48 Ill. App. 3d 141, 145, 362 N.E.2d 798, 801-02; *People v. Eason* (1976), 44 Ill. App. 3d 308, 314, 357 N.E.2d 1191, 1195), but the *Miranda* warnings and temporary cessation of questioning were, in the instant case, improperly supplemented by repeated efforts of the officers to wear down defendants' resistance and cause them to give up their right to remain silent. As we view the evidence, the officers followed the form but not the substance of honoring defendants' right to remain silent guaranteed to them by the constitution.

According to the police officers' testimony defendant Gibson was arrested at 2:30 p.m. and fully advised of his rights. He made certain inculpatory statements to Sergeant Brewer, but refused to make a formal statement, and was placed in a cell at about 3:30 p.m. When the North Chicago officers arrived at about 7:30 p.m., Gibson was questioned by them and he told them he did not want to talk to them but that he might do so when they got back to Lake County. At the hearing on the motion to suppress Officer Semasko was asked:

"Q. Did you ask him any other questions then?

A. We talked to him for a short period of time. I don't recall exactly what questions we asked him.

Q. Do you recall what any of his answers were?

A. Pertaining to his portion in this particular robbery, he just stated that he didn't want to talk to us at that time about it. That was about the extent of it."

The officer recalled further that after Gibson had invoked his right to remain silent the officers also inquired of him regarding his earlier statement to Sergeant Brewer and asked him why he wouldn't talk to them. He was also asked whether his statement to Brewer was correct and he confirmed that it was a true statement. Gibson was then returned to his cell. Later that night Sergeant Brewer came to see him and inqured again why he would not talk to the North Chicago officers; Gibson repeated he wanted to wait. A similar scenario occurred with defendant Jones who declined to speak to the officers on the two occasions in which he was questioned in East St. Louis.

During the seven-hour trip to North Chicago both defendants were questioned by the officers but persisted in their refusal to give statements regarding the robbery. Detective Semasko testified they again advised defendants of their rights during the trip and attempted to get statements from them, as follows:

"Q. During all this time when you were telling them they had a right to remain silent, you were not trying desperately to get them to break down and tell you everything that you thought would convict them, wasn't that the purpose of all your conversation?

A. We were trying to get them to give us a statement relative to this case, yes, sir."

On arrival at the North Chicago police station, defendant Gibson was again questioned and he agreed to discuss the robbery if defendant Jones was also present. Jones was brought in and, shortly thereafter, both defendants gave inculpatory statements which were recorded. These statements were produced some 25 hours after defendants were arrested on the robbery charge and after the five questioning sessions to which Gibson was subjected and the four sessions to which Jones was subjected, including the interrogation efforts made by the officers during the long trip to North Chicago from East St. Louis.

In *Mosley* the United States Supreme Court concluded that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" (423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326.) We find the instant case to be one in which the officers failed to scrupulously honor the decision to cut off questioning made by defendants. They persisted in further questioning of

Gibson after he had sought to cut if off; the officers reminded him of his conversation with Sergeant Brewer and inquired why he would not repeat it to them. We believe the officers' further efforts to breach defendants' decision to remain silent are amply demonstrated by their testimony that they were "trying to get them to give us a statement relative to this case" during the seven-hour automobile trip. Finally, at the last questioning session of Gibson in North Chicago they required Jones to be present while Gibson recorded his first statement. We believe the repeated efforts of the officers did wear down defendants' resistance and they ultimately were cajoled into waiving their privilege to remain silent. *Miranda v. Arizona* (1966), 384 U.S. 436, 476, 16 L. Ed. 2d 694, 725, 86 S. Ct. 1602, 1629; see *People v. Pendleton* (1974), 24 Ill. App. 3d 385, 396, 321 N.E.2d 433, 441; *United States ex rel. Doss v. Bensinger* (7th Cir. 1972), 463 F.2d 576, *cert. denied,* 409 U.S. 932, 34 L. Ed. 2d 186, 93 S. Ct. 239; *United States v. Crisp* (7th Cir. 1971), 435 F.2d 354, *cert. denied,* 402 U.S. 947, 29 L. Ed. 2d 116, 91 S. Ct. 1640; compare *People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7, *People v. Eason* (1976), 44 Ill. App. 3d 308, 357 N.E.2d 1191.

■■■ Defendants' convictions must be reversed on the basis that their confessions were obtained in violation of the procedural safeguard mandated by *Miranda*; their right to remain silent was not scrupulously honored by the officers and the statements obtained in derogation of such right must be suppressed. We conclude that all statements by these defendants should have been suppressed except for those initial statements made by defendant Gibson to Sergeant Brewer upon being questioned on the afternoon he was arrested. As to those statements we find no merit to defendant Gibson's further contention that the State did not show he had validly waived his right to the presence of counsel during questioning. The determination of whether the State met its burden of establishing by a preponderance of the evidence that defendant Gibson was advised of his constitutional rights and knowingly and intelligently waived them was for the trial court. (*People v. Mrozek* (1977), 52 Ill. App. 3d 500, 506, 367 N.E.2d 783, 786.) Although Gibson testified he thought he had the right to have a lawyer present only at court proceedings, the record is clear he was advised of and stated he understood his right to have an attorney present during questioning, Gibson was 18 years old at the time of arrest and had attended school into the 10th grade. He had significant previous experience with the criminal process and no claim of mental deficiency was made. Under these circumstances we find the trial court's decision was not contrary to the manifest weight of the evidence. *People v. Mrozek* (1977), 52 Ill. App. 3d 500, 506, 367 N.E.2d 783, 786.

■■ There is a second error in this case also requiring reversal. Detective Knox, who was called as a witness by the State, was permitted,

over defendants' objection, to testify in trial to a purported conversation by a Debra Davis with Sergeant Brewer who, in turn, related it to the witness Knox. Knox testified that Davis said defendants told her they were involved in the robbery. Neither Debra Davis nor Sergeant Brewer were called as witnesses in trial or were available for cross-examination. The State correctly concedes it was error for the trial court to permit the testimony, which was inadmissible hearsay (*People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738), but argues it is harmless error as the hearsay was merely cumulative of facts already in evidence through defendants' confessions.

■■■ The right of cross-examination is an integral part of the sixth amendment right of a defendant to confront the witnesses against him. (*People v. Smith* (1967), 38 Ill. 2d 13, 15, 230 N.E.2d 188, 190; see *People v. Marselle* (1974), 20 Ill. App. 3d 1012, 1014-15, 314 N.E.2d 21, 23.) In this case neither Debra Davis nor Sergeant Brewer testified at trial so that there was no opportunity to cross-examine them. We find that the admission of this double hearsay denied defendants their constitutional right to confront witnesses against them. Before it can be said that a Federal constitutional error can be held harmless a reviewing court must be able to declare beyond a reasonable doubt that the error did not contribute to the finding of guilty. (*People v. Marine* (1977), 48 Ill. App. 3d 271, 276, 362 N.E.2d 454, 458.) We are unable to say that this double hearsay did not contribute to the finding of guilty; the fact of a robbery was well established, but no witnesses identified either defendant as participating in it nor were they linked to it by any evidence other than their confessions.

For these reasons the judgment of the Circuit Court of Lake County as to each defendant is reversed and the cause remanded for a new trial.

Reversed and remanded.

BOYLE and WOODWARD, JJ., concur.