THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHNNY LEE SAVORY, Defendant-Appellant.

Third District   No. 77-420

Opinion filed April 4, 1980.

BARRY, J., dissenting.

Robert Agostinelli and Theodore A. Gottfried, both of State Appellate Defender's Office, of Ottawa, and Michael Margolies, law student, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE STOUDER delivered the opinion of the court:

After a jury trial in the circuit court of Peoria County, Johnny Lee Savory was found guilty of the murders of Connie Cooper and James Robinson, Jr. He was sentenced to concurrent terms of imprisonment of 50 to 100 years for each offense. On this appeal the defendant argues the court erred in denying his motion to suppress his confession because, first, there is no showing that he knowingly and voluntarily waived his constitutional rights; second, his right to refrain from responding to further questioning after he had indicated such an intention was not scrupulously observed; and third, his confession was not voluntary, considering the evidence as a whole. Defendant also contends the sentences imposed were excessive.

The defendant, Johnny Lee Savory, was 14 years old at the time these charges were brought. After a hearing it was decided the defendant should be prosecuted as an adult. The evidence at trial centered around the defendant's confession. The events and circumstances which preceded his oral confession and which were presented at the hearing on the defendant's motion to suppress his confession need to be summarized.

The bodies of the two victims were discovered on January 18, 1977, by the victims' stepfather, William Douglas, in the bedroom of their residence. Both had sustained multiple stab wounds. The police were notified, and this set into motion a large scale investigation. Many witnesses and suspects were interviewed and several were given lie detector tests.

Johnny Lee Savory, the 14-year-old defendant, was questioned by police officers beginning at 3:30 p.m. on January 25, 1977, in regard to the deaths of Connie Cooper and James Robinson. This interrogation began at the Late Afternoon School where the defendant was a student. At the outset of the interrogation, the defendant stated he did not want to talk. However, the police convinced him to talk. The defendant was not given any *Miranda* warnings at that time. At that time, the defendant gave police an account of his activities of the day prior to the murders.

The defendant related that on the day prior to the murders, he met James Robinson, Jr., at the Late Afternoon School at approximately 3:30. The pair left together at 6:30 p.m. and arrived at the Robinson residence at 7. Savory stated that Robinson took the keys from the mailbox and opened the front door to the house where they prepared some food. Savory told the police that he had taken hot dogs out of the refrigerator and some corn and prepared it in a skillet. After finishing their meal, the pair placed the television on the floor and practiced Kung Fu. At approximately 8 p.m., the pair went to the residence of a Miss Jones, who lent defendant $4. Defendant gave half the money to Robinson and they went to a restaurant and ate. After chasing home a young man who had called them a dirty name, the two returned to the Robinson residence. The pair again practiced Kung Fu, and at 11 p.m., defendant walked home. Defendant further told the police that he called Robinson on the phone that night and spoke until about 1:30 or 2 in the morning. The defendant said that Robinson asked defendant to return at 8, although the defendant did not do so.

At about 4 p.m., the officers asked the defendant to return with them to the police station and defendant agreed to do so. On the way to the station, defendant suggested they stop at his father's house so he could show them a knife that was similar to one owned by the victim, James Robinson, and the officers did so. Defendant went into the house alone

and returned without the knife saying that his father had the knife with him and was receiving medical attention at St. Mark's.

At 5 p.m., defendant was brought into an interrogation room at the police station and repeated his previous story before four officers. This session lasted about one-half hour. Later that evening, the defendant was again interrogated, this time with specific emphasis concerning certain factual discrepancies between some of the known facts and defendant's earlier statement. Specifically, defendant had stated that he was very close friends with Robinson and had in fact known both him and Cooper for many years. This, however, conflicted with other information known by the police. There also were discrepancies concerning who prepared the food that defendant and Robinson ate at the Robinson residence as well as the fact that the police had information defendant had not spoken to Robinson on the phone late in the evening prior to the murders. This session lasted one-half hour to 45 minutes.

Although he had made no incriminatory statements up to this point in time, defendant was taken to a polygraph examiner at 10 p.m. The defendant was accompanied by two police officers and his probation officer. The defendant was alone with the polygraph examiner for about an hour—until 11 p.m. At the end of the polygraph examination, the results of which were made known to Officer Cannon, the defendant was placed under arrest and read his *Miranda* rights. The defendant, in response, stated that he did not want to talk. At about 11 p.m., defendant was returned to the police station and later taken to the detention home for the night.

The following morning, January 26, 1977, defendant was reinterrogated. The reinterrogation began at approximately 10:30 a.m. at the police station with Percy Baker and Y. T. Savory, defendant's father, present. Officer Haynes, who did not testify at the suppression hearing, read defendant his *Miranda* rights. During the ensuing interrogation, defendant was confronted with several discrepancies at which time defendant would change his story. However, defendant still denied committing the murders. This session ended around noon, whereupon defendant was fed.

At 12:30 p.m. defendant was again interrogated in a short session. At that time, defendant stated he would tell everything to Officer Brown. Officer Brown then began a session with the defendant that lasted until 5 p.m. Although defendant gave a detailed statement of his activities, he still made no incriminatory statements. At the close of this session, defendant was forced to change clothes.

At approximately 6 p.m. defendant again took a polygraph examination. This session, with just the defendant and the examiner present, lasted about an hour and a half. At the end of the examination, Officer

Brown entered the examination room and the defendant then made incriminating statements. Defendant indicated to Officer Brown the location of some of the stab wounds. Defendant told Brown that he and Robinson were practicing Kung Fu and that Robinson wanted defendant to use the knife. Defendant stated that he accidentally stuck Robinson. Defendant said his mind went blank, and when Cooper came into the room, she came at him and he cut her.

Defendant then returned to the police station where he denied any involvement to Percy Baker, his probation officer. Officer Brown told the defendant that this was "backtracking" and began to question defendant for details of the murders.

Defendant filed a written motion to suppress the confession which was denied after a full hearing. The confession and earlier statements were heard as evidence at trial.

The rest of the State's evidence consisted primarily of a discussion of various pieces of physical evidence that was obtained at the Robinson-Cooper residence. The physical evidence related the nature of the victims' wounds, the physical setup of their home and did tend to show defendant had at some time been at the Robinson-Cooper residence. No eyewitnesses testified at trial.

In arguing the trial court erred in declining to suppress his confession the defendant urges the confession was not voluntary and refers to three areas which he contends support this conclusion. These areas include the failure of the defendant to waive his *Miranda* rights, his reinterrogation after he had declined to talk and finally, the length of the custodial interrogation. Although we will consider these areas separately, they are nevertheless interrelated and it is the combined effect of each which justifies our conclusion that defendant's confession should have been suppressed.

In arguing the court erred in refusing to suppress his confession the defendant first urges the evidence is insufficient to show his knowing and voluntary waiver of his *Miranda* rights.

■■■ It is well settled since *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, that it is the burden of the State to show that a person knowingly and voluntarily waived his rights of representation and to remain silent before a defendant's statement can be admitted into evidence. It is also true that a valid relinquishment of one's rights will not be presumed from silence.

As shown by the testimony presented at the hearing on the defendant's motion to suppress his confession, following conversations with police officers in the late afternoon and evening of January 25 the defendant took a polygraph test at about 10 p.m. Because of discrepancies revealed by this test police officer Cannon testified that he placed

the defendant under arrest and advised him of his *Miranda* rights. The defendant responded that he did not want to say anything more. Defendant was not questioned any further at this juncture and was thereafter lodged in the Peoria juvenile facility for the night. It is conceded by the parties that defendant had not waived or relinquished his right to remain silent but on the contrary had affirmatively expressed his right to remain silent.

On the following morning, January 26, the defendant was taken from the juvenile facility to the police station at about 10 o'clock in the morning. The defendant was again admonished of his *Miranda* rights, this time by police officer Haynes. At the time of the suppression hearing Haynes was suffering the effects of a broken jaw, and he did not testify at that hearing nor at the trial. At the suppression hearing police officer Fires testified that he heard Haynes advise the defendant of his *Miranda* rights and heard the defendant respond that he understood his rights. Fires also testified that even after the defendant indicated his understanding of his rights Haynes continued to discuss some point about his rights with the defendant but Fires could not recall the subject of the further discussion. Then, according to Fires, Haynes commenced questioning the defendant, the interrogation continuing until noon. During this period the defendant's father and Percy Baker were present. Also, during this period the defendant made no inculpatory statements.

After being advised of his rights the defendant did not sign any written waiver, although it does not appear that he was requested to do so and refused. Nor does the record reveal an explicit oral waiver of his rights in the specific terms which are usually a part of a written waiver. The record indicates that he was merely advised of his rights and questioning commenced.

■ Although *Miranda* requires warnings and waiver of constitutional rights no particular form of waiver is required. The waiver may be either express or implied. *United States v. Hayes* (4th Cir. 1967), 385 F.2d 375, and *Bond v. United States* (10th Cir. 1968), 397 F.2d 162. This rule was held to be an established application of the *Miranda* rule in the recent case of *North Carolina v. Butler* (1979), 441 U.S. 369, 60 L. Ed. 2d 286, 99 S. Ct. 1755. However, according to *Miranda*, waiver will not be implied either from a silent record or from the fact the defendant may have made statements. In *People v. Landgham* (1970), 122 Ill. App. 2d 9, 257 N.E.2d 484, where the facts were quite similar to those in the instant case, the record showed defendant was advised of his *Miranda* rights, but other than making an oral statement the record was silent concerning any evidence from which waiver could be inferred. In that case the court held the oral statements should have been suppressed.

■ In its brief the prosecution concedes that at the time defendant was

advised of his *Miranda* rights at about 10:30 on the morning of January 26, there is no evidence in the record warranting any inference the defendant waived his rights. So far as the record is concerned no questions were asked of the witness, as was the case in *Landgham*, about anything the defendant did or said indicating his waiver of his rights. The only evidence called to our attention by the prosecution is the defendant's statement made at about 1:30 in the afternoon that he would "tell everything." We are unable to see how this phrase made at least three hours after warnings were given and questioning commenced can be considered a knowing and voluntary waiver of the defendant's rights. In this connection no cases have been called to our attention by the prosecution supporting the conclusion urged by the prosecution.

Next the defendant contends the reinterrogation which commenced on the morning of July 26, after he had expressed his desire the previous night of not wanting to talk about the homicides, also violated the dictates of *Miranda*. Both parties have relied on *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321, in opposition and in support of the principle of custodial reinterrogation. The prosecution argues that under *Mosley* custodial reinterrogation is permissible and not *per se* foreclosed by *Miranda*. The prosecution also contends that custodial reinterrogation is not limited to questioning concerning other crimes by other police officers as was the factual setting in *Mosley*. We are inclined to agree with the prosecution that the principle of *Mosley* is not limited to its facts, but does suggest that the right of a defendant to remain silent may be scrupulously observed as required by *Miranda* and still permit reinterrogation where the compulsion and coercion of custody have been dissipated or attenuated by subsequent circumstances. This would of course include initiation of the questioning by the defendant (*People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56) and reinitiation of questioning about other offenses by the same police officers after a substantial lapse of time as in *People v. White* (1975), 61 Ill. 2d 288, 335 N.E.2d 457, *cert. denied* (1976), 424 U.S. 970, 47 L. Ed. 2d 738, 96 S. Ct. 1469, decided prior to *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321.

Circumstances which might dissipate or attenuate the inherent compulsion of a custodial setting would include at least the lapse of a significant amount of time together with the occurrence of some event communicated to the defendant which might indicate the reasonableness of the reconsideration of his position. If facts justifying reconsideration are relied upon it should be the burden of the prosecution to show that something had occurred and was communicated to the defendant upon which his change of position was predicated. This burden is not satisfied merely by the lapse of time and giving *Miranda* warnings again together with the defendant's waiver thereof. Where the defendant, as in the

instant case, has exercised his right to remain silent, the record should show at the minimum that before reinterrogation was commenced, the defendant had changed his mind, and that there was some reason for his change of mind before the resumption of questioning could be deemed voluntary.

■■ In the instant case at the initiation of the police officers the defendant was taken from the detention facilities to the interrogation rooms at the police station and reinterrogation was commenced with the giving of *Miranda* warnings by an officer who was aware of the defendant's exercise of his right to remain silent the night before, but without any reference of defendant's prior exercise of his right. Although defendant's father was present on the morning of January 26, there is no indication in the record that the father's presence was the reason for reinitiating the interrogation by the police officers either before the defendant was brought to the interrogation room or afterward. It should also be noted that when custodial reinterrogation was commenced in the morning the defendant had been questioned more or less continuously from about 3 o'clock of the afternoon of the previous day until about 11 o'clock at night when he was arrested and then detained. It should also be recognized that the defendant was only 14 years old and already on probation. Where, as in this case, the principal circumstance relied upon to support reinterrogation is the lapse of time and where the prosecution concedes the record fails to disclose a waiver of constitutional rights at the time they were readministered to the defendant, we fail to see how reinterrogation can be approved. Indeed where the lapse of time relates to the incarceration of a 14-year-old boy in a detention facility, it is difficult to avoid the conclusion that such consideration was affecting the defendant's conduct.

■ Finally, when the previously described circumstances are combined with the length of time defendant was questioned, additional support is afforded for the general conclusion the defendant's statements were not proved to be voluntary. The test to be applied in determining the voluntariness of a statement is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) See *Haley v. Ohio* (1948), 332 U.S. 596, 92 L. Ed. 224, 68 S. Ct. 302, and *People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383, where the courts indicated special care should be given in scrutinizing the record to determine voluntariness where the defendant was a juvenile. At the hearing on the suppression motion the trial court was specially concerned with the period of from 3 o'clock in the afternoon until 11 that night and in particular whether defendant was

under arrest during this period and whether the questioning should have been considered custodial interrogation. As a result of the hearing the trial court was satisfied defendant was not in custody prior to his arrest at 11 p.m. because, according to the testimony of the police officers, the defendant was not a suspect during this period of time and in fact other persons had been given polygraph tests without being arrested or charged. Nevertheless, we do have a period of approximately eight hours, interrupted by a meal, of questioning on January 25 and then an additional period of questioning, interrupted by meals, commencing at about 10:30 in the morning of January 26 and continuing until about 8 p.m. when the inculpatory statements were made. We also observe that thereafter the defendant did not reaffirm his inculpatory statements but in fact recanted them shortly after they were made. Without deciding that the length of questioning would of itself justify suppression of the statements as not voluntary, we do believe the cumulative effect of all of the circumstances does compel the conclusion the prosecution did not sustain its burden of establishing the voluntariness of the statements. We believe the error in admitting the statements requires a new trial because we can not say beyond a reasonable doubt that it did not contribute to the verdict of the jury under the authority of *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

For the foregoing reasons the judgment of the Circuit Court of Peoria County is reversed and this cause is remanded for a new trial consistent with the views expressed herein.

Reversed and remanded.

SCOTT, J., concurs.

Mr. JUSTICE BARRY, dissenting:

I must dissent from the opinion of the majority because, for the reasons I am about to state, I firmly believe that the defendant's motion to suppress his confession was properly denied.

The majority's opinion hinges upon the finding that the defendant's right to remain silent, exercised after his arrest the evening of January 25, was violated by the subsequent interrogation by the Peoria police the next morning. In *Michigan v. Mosley* (1975), 423 U.S. 98, 46 L. Ed. 2d 313, 96 S. Ct. 321, the United States Supreme Court concluded that "the admissibility of statements obtained after the person in custody had decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" (423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326.) The Supreme Court found that the defendant's right to remain silent was scrupulously honored under

circumstances where there was a significant lapse of time between the defendant's assertion of his right not to talk and the reinterrogation (2 hours), the defendant was read his *Miranda* rights prior to the reinterrogation, and the reinterrogation concerned an offense different from the one for which the defendant was taken into custody. Although in the instant case the reinterrogation of defendant Savory the morning after he asserted his right to remain silent involved the same offense for which he was arrested, this fact alone does not necessitate a finding that the defendant's right to remain silent was not scrupulously honored. As the majority admits, the principle of *Mosley* is not limited to its facts. Indeed, this court has recently stated that the fact the second interrogation involved a completely different subject matter is only an "additional circumstance" which tends to demonstrate that the defendant's right to remain silent was scrupulously honored (*People v. Faison* (1979), 78 Ill. App. 3d 911, 397 N.E.2d 1233). However, it is essential that the record reflect, at the very least, a complete cessation of questioning for a significant period of time after the defendant indicates he wishes to remain silent coupled with the giving of a complete set of *Miranda* warnings prior to the initiation of reinterrogation. *Faison.*

In the case at bar, once the defendant exercised his right to remain silent, all questioning by the police ceased. The defendant was not reinterrogated until 10:30 the next morning (with his father and legal guardian present) and after he was read his *Miranda* rights a second time. Under a similar factual situation, the Second District, in *People v. Eason* (1976), 44 Ill. App. 3d 308, 357 N.E.2d 1191, held that the defendant's right to remain silent was scrupulously honored, and a statement made as a result of the reinterrogation admissible. In *Eason*, the defendant was arrested for armed robbery and taken to the police station. After receiving his *Miranda* rights, signing a waiver form, and participating in a lineup, he refused to answer any more questions. Accordingly, the interrogation ceased and he was placed in his cell. The next morning, after being read his *Miranda* rights a second time, he refused to offer any information about the robbery. In response, one of the officers stated, "Well, you probably wouldn't say anything if you could walk out of here scot-free." The defendant then said "that would be a different story," and when asked what he meant by that statement, made the statements which were the subject of his later motion to suppress. The defendant contended that this second interrogation was violative of *Miranda* and *Mosley.* The Second District, however, disagreed:

> "In the instant case the police discontinued their initial interrogation when the defendant refused to answer questions. A significant period of time passed before the detectives again advised him of his rights and, although they were still investigating

the same crime, the defendant voluntarily agreed to talk with them.

We hold that the statements in the instant case were not obtained in violation of *Miranda* and that the defendant voluntarily made those statements after being afforded the protection outlined in *Michigan v. Mosley*." (44 Ill. App. 3d 308, 314, 357 N.E.2d 1191, 1195.)

Just as the defendant's right to remain silent was scrupulously honored in *Eason*, defendant Savory's right to remain silent was scrupulously honored in the instant case. This is not a case in which the Peoria police officers, by questioning the defendant with regard to the discrepancies in the stories he had told the previous day, after a complete cessation of questioning for almost 12 hours and the giving of a fresh set of *Miranda* warnings, made a conscious attempt to wear down the defendant through repeated and continuous interrogations for the purpose of obtaining a confession. (See, *e.g., United States ex rel. Doss v. Bensinger* (7th Cir. 1972), 463 F.2d 576, *cert. denied* (1972), 409 U.S. 932, 34 L. Ed. 2d 186, 93 S. Ct. 239; *United States v. Crisp* (7th Cir. 1970), 435 F.2d 354; *People v. Gibson* (1977), 55 Ill. App. 3d 929, 371 N.E.2d 341.) The Peoria police recognized and respected the defendant's exercise of his right to remain silent as evidenced by the resumption of interrogation only after a significant period of time had passed and new warnings were given. The testimony at the hearing on the motion to suppress reveals that the defendant "acquiesced without being subjected to compulsion or intimidation after being fully informed of his rights." (*People v. Pittman* (1973), 55 Ill. 2d 39, 56, 302 N.E.2d 7, 15-16.) The resumption of questioning was not violative of the principles of *Miranda* and *Mosley*.

The majority takes the position that even though a reinterrogation following a defendant's exercise of his right to remain silent may be preceded by a significant time interval and a second set of *Miranda* warnings, a statement subsequently made by the defendant is automatically rendered inadmissible unless the State proves in addition that some event was communicated to the defendant which would "indicate the reasonableness of the reconsideration of his position." The placing of this added burden upon the State is not mandated by *Miranda*, *Mosley*, or the constitution, nor in my view is it required. The right of a criminal defendant to remain silent is amply protected by examination of police conduct in light of *Mosley*. If the record reflects a *failure* on the part of law enforcement authorities to appreciate and honor a defendant's desire to terminate questioning through the exercise of his constitutional rights, the exclusionary rule operates to prevent any statements obtained as a result of the resumption of interrogation from being admitted into evidence regardless of the defendant's motivation for speaking. Likewise,

if the dictates of *Mosley* are followed, and the defendant's right to remain silent is scrupulously honored, the reason why the defendant speaks pursuant to a subsequent interrogation is, for *Mosley* purposes, irrelevant. What is under scrutiny in both *Mosley* and *Miranda* is police conduct and procedure, not the reasoning behind the defendant's decision to speak. The majority's decision to impose upon the State the added burden of showing the defendant's motivation to make a statement does not aid in the elimination of overt attempts by law enforcement authorities to elicit confessions from suspects through ceaseless interrogation once the police are informed that questioning is to be terminated, which is the aim of *Mosley* and *Miranda*.

Assuming arguendo that the State has the added burden of showing that there was communicated to the defendant some event "which might indicate the reasonableness of the reconsideration of his position," I believe this burden has been met in the instant case. The record reveals adequate motivation for the defendant's decision to waive his previously asserted right to silence. Present with the defendant when the reinterrogation commenced on the morning of January 26 were his father and Percy Baker, his legal guardian. At the outset, the defendant was confronted with a number of discrepancies that existed in the statements he had made to the police the previous day regarding his activities the day of the murders. There can be little doubt that defendant Savory's conscious and voluntary decision to waive his right to silence and speak was motivated at least in part by a desire to explain away the discrepancies in the presence of his father and guardian. (*Cf. People v. Perez* (1979), 72 Ill. App. 3d 790, 391 N.E.2d 456 (defendant decides to speak after being confronted with victim's ring).) In light of the circumstances, the defendant's decision to speak was reasonable, and I believe satisfies the requirement of the majority, if it be necessary, regarding the burden placed upon the State beyond that imposed by *Mosley*.

Even if the defendant's right to remain silent was violated by the resumption of questioning the morning following his arrest, I believe that the defendant's confession, given much later in the day, was nevertheless admissible. The failure of the police to honor a defendant's right to remain silent constitutes a violation of the procedural safeguards mandated by *Miranda*. (See *People v. Gibson* (1977), 55 Ill. App. 3d 929, 371 N.E.2d 341.) However, the Illinois Supreme Court has held that the effect of such procedural *Miranda* violation may be neutralized by subsequent events so as to make a confession obtained after the violation admissible. (*People v. White* (1975), 61 Ill. 2d 288, 335 N.E.2d 457.) In *White*, the supreme court was faced with a procedural *Miranda* violation in the form of a failure to furnish the defendant with counsel after

representation was requested. The court found that "the effect of the procedural violation of the *Miranda* standards was sufficiently dissipated by lapse of time, repeated admonitions and other intervening events so that the defendant's confession was voluntary and was therefore properly received in evidence." (61 Ill. 2d 288, 297, 335 N.E.2d 457.) Applying the factors found to be important in *White* to the case at bar, it appears that the effect of the *Miranda* violation (if there was one at all) was sufficiently attenuated, and the confession therefore properly obtained. The alleged *Miranda* violation occurred at approximately 10:30 a.m. on January 26 when reinterrogation commenced. No confession, however, was obtained until 7:30 that evening. During the time between the resumption of interrogation and the eventual confession, the defendant ate two meals, was allowed to speak at length with Officer Marcella Brown after requesting an opportunity to speak with her privately (and after stating that he "would tell everything"), changed his clothes and voluntarily took a second polygraph examination. It is true that repeated *Miranda* admonitions were not given during the day, but "it is not necessary to repeat the warnings at the beginning of each successive interview to avoid a *Miranda* violation." (*People v. Bundy* (1979), 79 Ill. App. 3d 127, 133, 398 N.E.2d 345, 349.) The lapse of time from the commencement of reinterrogation to the subsequent confession, coupled with the circumstances and the events during the day, attenuated any deleterious effect of the initial *Miranda* violation. For this alternative reason the confession was properly received into evidence.

The majority concludes by stating that all of the facts in this case support the "general conclusion" that the defendant's statement was involuntary. In *People v. Ybarra* (1977), 46 Ill. App. 3d 1049, 1050, 361 N.E.2d 678, 679, the court stated:

"Whether a statement is voluntarily given depends upon the totality of the circumstances. The test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed. In making its decision, the trial court need not be convinced beyond a reasonable doubt, and the trial court's finding that the statement was voluntary will not be disturbed unless it is contrary to the manifest weight of the evidence. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied*, 412 U.S. 918.)"

(Accord, *People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7; *People v. Boerckel* (1979), 68 Ill. App. 3d 103, 385 N.E.2d 815.) It cannot be denied that in this case the defendant was in custody for over 24 hours before he confessed to the murders of James Robinson and Connie Cooper (although until approximately 11 p.m. on the 25th he was not a suspect, and there is no evidence that he would have been restrained had he

attempted to leave the police station prior to that time), and there is no doubt that courts are to be particularly mindful of interrogations involving juveniles. (*Haley v. Ohio* (1948), 332 U.S. 596, 92 L. Ed. 224, 68 S. Ct. 302; *People v. Simmons* (1978), 60 Ill. 2d 173, 326 N.E.2d 383; *People v. Stone* (1978), 61 Ill. App. 3d 654, 378 N.E.2d 263.) However, the circumstances surrounding this confession compel a finding of voluntariness. When the questioning of the defendant resumed on the morning of January 26 after a complete cessation for almost 12 hours, the defendant was not told by the police to confess to the murders. He was, rather, merely confronted with the discrepancies in his previous statements, and asked to explain them. Shortly before noon, the defendant's father, who had been present, told the defendant to tell the truth. At noon, the defendant ate lunch by himself, and approximately 35 minutes later told two police officers and his guardian Baker that he would "tell everything" but only to Officer Marcella Brown. At this time Officer Brown and the defendant met privately in the office of the juvenile bureau lieutenant, and, according to Officer Brown, the first thing the defendant told her was "to get a piece of paper and a pencil and write down everything he told me having to do with this incident." The defendant then described, in narrative form, his activities on the day of the murders, insisting that Officer Brown write down everything. When the defendant was finished, Officer Brown asked the defendant's legal guardian, Baker, to come into the office. It was readily apparent that the statements the defendant had previously given to Baker were inconsistent with the statement he had just given to Brown, and consequently both Brown and Baker asked the defendant to explain the discrepancies. About 45 minutes later they were joined by Officer Fires. At 4:30, the questioning ceased, and the defendant had dinner. After dinner, the defendant changed his clothes and at approximately 6 arrived at the office of the polygraph examiner with Officers Brown and Fires and Mr. Baker. No police officers were present when the defendant took the examination. At approximately 7:30 the polygraph examination ended and, Officer Brown testified, the following occurred:

"A. I entered the polygraph room where Johnny Savory was seated in a chair and had a conversation with him.

Q. Did he indicate a willingness to talk with you at that time?

A. Yes, he did. I asked him what he wanted to talk to me about and he had requested to talk to me and he then gave me a narrative of his involvement in the murders in this case and admitted that he had killed Connie Cooper and James Robinson.

Q. Who was present at that time?

A. Just myself and Johnny Savory."

At no time prior to his confession was the defendant told to confess to the murders of James Robinson and Connie Cooper. The police officers instead focused their questioning of the defendant on the discrepancies in his story. The defendant never told the police to cease the questioning. In addition, he agreed to take the polygraph examination on the evening of the 26th, and when he eventually did confess, did so voluntarily and to the police officer whom he apparently trusted the most and with whom he felt the most comfortable. This is not a case where police compulsion caused a defendant's will to be overcome. The defendant here, who was street-wise and not naive with regard to the procedures of the police department, simply realized that he had been caught in a web of his own making and had no recourse but to admit the killings. I believe the confession was voluntary, and would affirm the defendant's convictions.