2020 IL App (1st) 162751

No. 1-16-2751

Opinion filed September 30, 2020

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 06 CR 9243 |
| | ) | |
| TAMARA WOODS, | ) | Honorable |
| | ) | Erica L. Reddick, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices Hall and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Tamara Woods, who is currently serving a 20-year sentence for first degree murder, appeals from the circuit court's second-stage dismissal of her petition for postconviction relief. She argues that a third-stage evidentiary hearing is warranted because her petition makes a substantial showing that her inculpatory statements to police were involuntary and that her trial counsel was ineffective for failing to present the entirety of her video-recorded interrogation at her suppression hearing and trial. She also argues that her appointed postconviction counsel failed to comply with the requirements of Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013) and

rendered unreasonable assistance. For the following reasons, we reject defendant's contentions and affirm the circuit court's judgment dismissing her petition.[1]

¶ 2                                    I. BACKGROUND

¶ 3      At a bench trial in 2008, defendant was convicted of the first degree murder of McKinley Walker, who was shot to death on the evening of March 10, 2006, on a sidewalk half a block from defendant's home on the west side of Chicago. Several days later, defendant admitted to police that she lured Walker to her home at the request of David Hanes, a former boyfriend and member of the New Breeds street gang, who told her that he and his associates wanted to kill Walker in retaliation for Walker's killing of New Breeds gang member Michael Spencer in the late 1980s. (Walker was convicted of Spencer's murder in 1990 and had recently completed his prison sentence.) Defendant explained that, shortly after Walker left her home that evening, she called and told Hanes. Walker was shot and killed moments later. Although the shooter was never identified or charged, the trial court found defendant accountable for Walker's murder.

¶ 4                           A. Motion to Suppress Statements

¶ 5      Before trial, defendant moved to suppress her statements as involuntary. Detectives James Adams and Michael Landando testified for the State at the suppression hearing. Detective Adams testified that he and two other detectives spoke with defendant several hours after the shooting. He explained that the detectives wanted to speak with defendant because she lived near the scene of the shooting and was the last person to have seen Walker alive. The conversation took place at the

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

police station and lasted for about 15 minutes. The detectives did not take defendant into custody at that time and she was allowed to leave.

¶ 6    Detective Adams' next interaction with defendant occurred three days later. On March 13, 2006, around 11:45 p.m., Detectives Adams and Landando called defendant and left a message that they wanted to speak with her. Defendant returned the detectives' call on March 14, 2006, around 2:45 a.m., and asked for a ride to the station. Detectives Adams and Landando picked defendant up and returned to the station with her around 4:20 a.m.

¶ 7    The detectives placed defendant in the station's homicide office, a room of about 15 square feet with desks, computers, and file cabinets. The office was not locked and defendant was not handcuffed. The detectives began to speak with defendant around 4:45 a.m. During the conversation, the detectives confronted defendant with information they had learned from Walker's sister, namely, that defendant was acquainted with members of the New Breeds who wanted to kill Walker in retaliation for Spencer's murder. The conversation lasted about an hour. When it ended, defendant remained in the office as the detectives continued their investigation. While she waited, defendant was given water to drink and allowed to use the bathroom several times.

¶ 8    No further discussion regarding Walker's death occurred until around 7:30 a.m. At that time, as defendant was returning from the bathroom, she began to cry and make a statement. According to Detective Adams, the statement did not amount to an admission. But Detective Landando believed defendant was about to make an incriminating statement, so he cut her off and advised her of her *Miranda* rights. Detective Landando testified that defendant did not invoke her rights at that time.

¶ 9    Detective Landando then brought defendant to an interview room and activated its electronic recording system. After entering the interview room, Detective Landando again advised defendant of her *Miranda* rights. At the suppression hearing, the State played a minute-long clip from the interview room video. The clip begins with Detective Landando entering the interview room around 7:41 a.m., as defendant is seated on a bench. Defendant has a bottle of water and appears to be smoking a cigarette. She is not handcuffed. She is wearing a long-sleeve shirt and appears to have a winter coat next to her on the bench. Detective Landando informs defendant that she has the right to remain silent, that anything she says can be used against her in court, that she has the right to an attorney, and that if she cannot afford an attorney, one will be provided for her. Defendant responds that she understands those rights. Although defendant speaks softly, she appears alert.

¶ 10    Detective Landando testified that defendant did not seem confused and that she appeared to understand what he was saying. He testified that during their earlier conversation in the homicide office, defendant responded to questions appropriately and did not appear distraught or unable to focus. Detective Landando denied striking, or observing anyone else strike, defendant. He denied threatening to hit defendant or promising her leniency if she made a statement. He denied showing defendant a piece of paper with "20 to 120" written on it and telling her that she would get that much time in prison. He likewise denied telling defendant that she would get only five years in prison if she helped the detectives. He denied telling defendant that she would lose her child if she went to prison. He denied calling defendant "a lying bitch" because she was not telling detectives the story they wanted to hear. He also denied shaking his finger in defendant's face and hitting her lip.

¶ 11 Detective Adams could not recall if he ever entered the interview room, but he testified that during the earlier conversation with defendant, he never observed Detective Landando or anyone else hit or threaten to hit defendant. He also testified that neither he nor anyone else in his presence offered defendant leniency if she were to make an inculpatory statement. He testified that defendant's responses to questions were coherent and that she did not seem confused.

¶ 12 Defendant testified that she was 28 years old at the time of the interview and a high school graduate. She recounted that, on the evening of Walker's death, she spoke with detectives at the hospital and then at the police station for about 20 to 30 minutes. She testified that, two or three days later, around midnight, she received a call from a friend, who told her that the police wanted her to return to the station to pick up Walker's belongings and look at pictures to aid in the investigation.

¶ 13 Defendant testified that she called the detectives around 2:45 a.m. and asked for a ride to the station. She testified that Detective Landando and another detective picked her up between 3 a.m. and 4 a.m. She testified that, before receiving the call from her friend, she had been at her cousin's house smoking and drinking. She claimed that the detectives could tell she was intoxicated "because they smelled the weed and the drinks reeking out of [her] when [she] got in the car with them."

¶ 14 Defendant testified that after arriving at the station, the detectives put her in a room and did not talk to her immediately. She testified that the detectives then showed her pictures of several men and asked if she knew them. She testified that the detectives also confronted her with information they had learned from Walker's sister.

¶ 15    Defendant agreed that the detectives had allowed her to use the bathroom several times and that when returning from the bathroom on one occasion she began to cry. She testified that she was crying because the detectives showed her an envelope with "20 to 120" written on it and told her that was how much prison time she was going to get. According to defendant, the detectives told her she would be charged with accountability, conspiracy, and first degree murder and was going to go away for a long time and not see her son. She testified that the detectives told her she would get only five years in prison if she cooperated and named the person "who they claim[ed] *** was supposed to [have] been the one who did it."

¶ 16    Defendant also testified that, later in the interview room, Detective Landando hit her in the mouth with his finger while pointing at her and calling her "a lying son of a bitch." She identified two photographs taken three days later which she claimed showed "a gash over [her] lip" caused by Detective Landando. On cross-examination, while demonstrating how Detective Landando hit her, defendant made a motion with her hand indicating that Detective Landando also made contact with the knuckles of his left hand.

¶ 17    Defendant agreed that Detective Landando advised her of her *Miranda* rights in the interview room, but she testified that he did so only "after all the coercion and intimidation." She testified that she had never heard her rights before and did not understand them. On cross-examination, however, she conceded that she had been arrested twice before and had probably been read her rights on those occasions. Although she conceded that the detectives told her she had the right to remain silent, she claimed that she did not understand what that meant at the time because she was under the influence of alcohol and drugs. She testified that she did not truly understand her rights until several hours later, after making her incriminating statements, when

she read a description of her rights on a form posted on the wall of the interview room. After that, she told Detective Landando that he had violated her rights, but he told her that he "didn't want to hear it" and walked out of the room after asking her a few more questions.

¶ 18    Defendant testified that she made the incriminating statements because she was coerced and intimidated and that Detective Landando had coached her to say what she did. She reiterated that Detective Landando "scared [her] into saying everything that [she] said" by telling her that she was going to get a lengthy prison sentence and not see her son again. According to defendant, Detective Landando told her that the suspected shooter was a known felon and "was going to make it seem like [defendant] did it[,] so [she] might as well tell on him first."

¶ 19    On cross-examination, defendant conceded that Detective Landando "didn't tell [her] exactly what to say." Instead, she claimed, he told her that she would only "get five years if [she] just [went] along with what was supposed to [have] been happening." But she admitted that portions of her statement were true, such as that she had sex with Walker a few hours before he was killed and that she called Hanes after Walker left her house. She also admitted that the detectives had not told her to say that she knew Hanes and his friends wanted to kill Walker and agreed that those were "[her] words." On redirect, she testified that the portions of her statement that were untrue were that Hanes was the one who shot Walker and that she had known about his plan. She also clarified that, while her statement about knowing that Hanes wanted to kill Walker consisted of "[her] words," it was something that the detectives wanted her to say and was not actually true.

¶ 20    The State recalled Detective Landando in rebuttal. He again denied hitting defendant. He also testified that he did not notice an odor of alcohol on defendant's breath or detect that she was

under the influence of marijuana or any other drug when he and Detective Adams picked her up. He testified that defendant was coherent, lucid, and did not appear to be intoxicated. He also testified that she never told him she was intoxicated or under the influence of drugs or alcohol. He denied telling defendant to say that Hanes was the shooter and also denied promising her a five-year sentence if she would admit to her role in the shooting.

¶ 21    After hearing argument from counsel, the trial court denied defendant's motion to suppress. The court found no evidence that the detectives physically or psychologically coerced or intimidated defendant and concluded that defendant's willpower had not been overborne. With respect to the alleged injury to defendant's lip, the court found that the markings shown on the photographs defendant produced were inconsistent with the type of contact she described. Rather, the court found that the photographs appeared to depict several cold sores on defendant's lip.

¶ 22                                B. Trial

¶ 23    The case then proceeded immediately to trial. The parties stipulated to the admission of Detectives Adams' and Landando's suppression hearing testimony and the State recalled the detectives to give additional testimony. Detective Adams testified that he responded to a reported homicide at 5319 West Ohio Street on March 10, 2006, around 10 p.m. That location was about half a block from defendant's residence. When Detective Adams arrived at the scene, he observed a pool of blood on the sidewalk and a black knit hat. The victim, Walker, was in an ambulance still at the scene. The black knit hat had a bullet hole in the back and contained what appeared to be brain matter. Detective Adams also found a 9-millimeter shell casing and a white baseball hat at the scene. Eyewitnesses described the shooter as a black male, approximately 17 to 20 years old, 5 feet, 6 inches tall, weighing 160 pounds, and wearing a white baseball hat.

¶ 24    Detective Landando testified that he had a 30-minute conversation with defendant shortly after placing her in the interview room around 7:30 a.m. He testified that he had another conversation with defendant around 1 p.m. the same day that lasted about 30 to 40 minutes. The State published portions of both conversations, playing a total of four clips from the interview room video.

¶ 25    The first clip (timestamped 7:40:56 to 7:41:51) is the same minute-long clip that the State played during the suppression hearing, in which Detective Landando advises defendant of her *Miranda* rights and defendant indicates that she understands those rights. In the clip, as we noted, defendant is seated on a bench in the interview room. She is not handcuffed. She has a bottle of water and a cigarette. She is wearing a long-sleeve shirt and has what looks to be a winter coat next to her on the bench. She appears alert and aware of her situation and surroundings.

¶ 26    The second clip (timestamped 7:41:51 to 7:53:43) begins immediately after the first clip ends. Defendant remains seated on the bench. Detective Landando is standing about three to four feet in front of her. Throughout the clip, defendant speaks coherently. She is alert and does not show signs of discomfort or distress. Detective Landando asks defendant to tell the truth about Walker's death. Defendant explains that she has known Hanes all her life and previously dated him. She states that she had not seen or heard from Hanes in a while until he called her several times in the past week. That same week, a friend told her that Walker had recently been released from prison. She told her friend that she wanted to meet Walker. Two days before Walker's death, defendant got together with Walker and brought him to her house.

¶ 27    The next day, Hanes called defendant and said that he heard she was "fucking around" with Walker. Defendant told Hanes it was true and called Walker her "bay-bay." Hanes said "cool" and

told defendant he would call her right back. When Hanes called back, he told defendant he was standing next to her eight-year-old son and if she did not cooperate with him and unnamed others, they would kill her and her son. When defendant asked Hanes what he was talking about, Hanes said they wanted to kill Walker in retaliation for Walker's killing of Spencer. Defendant told Hanes she wanted no part of it and pleaded with him to leave her son alone, but Hanes responded, "You heard what I said." Defendant then said, "OK, I'll do whatever you want me to do." Hanes told defendant to get Walker over to her house. She agreed to do so in light of Hanes's threat to harm her son.

¶ 28    The following evening, defendant brought Walker to her house. Around 8:30 p.m., Hanes called defendant and asked whom she was with. She told Hanes that she was with her "bay-bay," which Hanes knew meant Walker. Hanes said "alright" and told defendant he would call her back. When defendant's phone rang later, she did not answer the call because she and Walker were having sex. Later, when Walker was getting ready to leave, Hanes called defendant again, but defendant missed the call. Around the same time, defendant noticed a "little scuffle" outside from a nearby party. As Walker left, defendant watched him through the window for a short time but lost sight of him by a tree. About a minute or two after Walker left her house, defendant called Hanes back. Hanes asked defendant where Walker was and defendant told him that Walker had just left. When asked how much time elapsed between her telling Hanes that Walker had just left and learning that Walker had been shot, defendant responded that "it seemed like it was back to back."

¶ 29    The third clip (timestamped 13:00:35 to 13:02:45) begins with the second conversation already in progress. Detective Landando and an unidentified sergeant are in the interview room

with defendant. Defendant is seated on the bench. She remains unhandcuffed. She now appears to have the winter coat draped over her lap. She continues to appear alert. As the clip begins, Detective Landando is standing three to four feet away from defendant. The sergeant is standing within one or two feet of defendant, but he soon takes a few steps back.

¶ 30    Detective Landando tells defendant that they know she was lying earlier when she said that Hanes threatened her son. He explains that they learned defendant had taken her son to stay with her mother in New Breeds gang territory, which Detective Landando says would make no sense if defendant thought the New Breeds were threatening her son. Detective Landando raises his voice and gesticulates with his hands, but he remains at least three to four feet away from defendant. Defendant concedes that she lied about Hanes threatening her son. The sergeant then takes a few steps closer to defendant. He tells her, "I know you feel bad, and you think you're going to be in trouble," and then asks her to "just tell me the truth." Defendant briefly puts her hands on her head but then lowers them to her lap. In a soft voice, appearing to choke back tears, she responds that "it wasn't never my son they threatened, it was always me."

¶ 31    The final clip (timestamped 13:16:28 to 13:20:25) begins later in the same conversation. Defendant remains seated on the bench without handcuffs. The winter coat is still draped over her lap. Detective Landando and the sergeant are standing three to five feet away from her. She appears alert. She speaks coherently and does not exhibit signs of discomfort or distress. She says that Hanes called her several hours after Walker's death and told her that he had killed "the man" and that she needed to "get low." When she vacillates between whether Hanes said "I" killed Walker or "we" (meaning him and "his guys") killed Walker, the sergeant reminds her that Hanes is the only person she claims to have spoken to about the plan. The sergeant then moves closer to

defendant and tells her that Hanes is "trying to put you in the middle." With his voice raised, he tells her, "Don't be skipping steps here, OK. If you didn't fucking pull the trigger, don't be taking the weight for shit you didn't do." The sergeant tells her to "tell me what he said," and Detective Landando interjects, "Don't fucking sugarcoat it." Defendant responds that Hanes told her "I shot him" and "you need to get low." She admits that she and her son went to stay with her mother after Walker's death because she knew the police would be looking for her. The clip concludes with defendant agreeing that, when Hanes told her he was going to "get" Walker, she understood that Hanes meant he was going to "shoot" Walker.

¶ 32    On cross-examination, Detective Landando testified that he talked to defendant "quite a few times in the two days" that she was at the station and agreed that "a whole lot" of their conversations were not included in the video clips played by the State. Detective Landando agreed that, at some point, he asked defendant if she would be willing to take a polygraph test. Defendant said she would be willing to do so but no polygraph test was ever administered. Defense counsel asked Detective Landando whether defendant eventually recanted her inculpatory statements, but the trial court sustained the State's objection to the question.

¶ 33    Detective Landando further testified that police arrested Hanes after defendant implicated him. Hanes was placed in a lineup but was not identified by eyewitnesses as the shooter. In addition, forensic testing revealed that Hanes's DNA did not match DNA found on the white hat that was recovered at the scene. Hanes was eventually released without being charged. Several months later, police arrested Kidonne Smith, whose DNA partially matched the DNA found on the white hat. But Smith was also released without being charged when eyewitnesses did not identify him as the shooter.

¶ 34    Defendant did not testify, call other witnesses, or present any evidence. In closing argument, defense counsel challenged the reliability of defendant's inculpatory statements. Counsel asserted that defendant later recanted those statements. He argued that, after defendant read her rights posted on the wall of the interview room, she retracted her prior statements and told detectives they had tortured her into confessing. Counsel also argued that defendant's inculpatory statements were unreliable on their own terms. He stressed that no evidence linked Hanes to the shooting and that the State had not shown any nexus between defendant and the actual shooter, who remained unknown. Counsel suggested it was equally likely that Walker was killed by a stray bullet when he unwittingly walked into a street fight that had erupted at a nearby party.

¶ 35    After recessing for several weeks, the trial court found defendant guilty based on principles of accountability. The court rejected the defense theory that Walker was accidentally struck by a stray bullet from a nearby street fight. Noting Walker's life experience, the court found it hard to believe that he "would foolhardily walk into the middle of an altercation in which weapons were being used." And though the court acknowledged that Walker's assailant had not been identified, it concluded that defendant's statements to police established that she attempted to aid, promote, or facilitate Walker's murder.

¶ 36                                    C. Direct Appeal

¶ 37    On direct appeal, we rejected defendant's challenge to the sufficiency of the evidence. After reviewing the video clips of defendant's custodial statements that were introduced at trial, we found that the evidence, viewed in the light most favorable to the State, "proved defendant guilty beyond a reasonable doubt of first degree murder based on the theory of accountability." *People v. Woods*, 2011 IL App (1st) 091670-U, ¶ 41.

¶ 38    We also rejected defendant's contention that she did not knowingly and intelligently waive her *Miranda* rights. Although she had not made the argument below, defendant asserted that Detective Landando tricked her into waiving her right to remain silent by telling her that the recording of their conversation in the interview room was for detectives and prosecutors only. *Id.* ¶ 64. We noted that Detective Landando made the comment when defendant noticed the camera in the room and asked whether "everybody, family, everybody [was] hearing [her]." *Id.* ¶ 65. We also noted that, prior to that exchange, Detective Landando had twice given defendant *Miranda* warnings and that defendant had indicated she understood her rights. *Id.* ¶ 66. We found that, in that context, the clear import of Detective Landando's comment was that the conversation could not be heard by the victim's family members or other people who might be outside the interview room and that it did not contradict Detective Landando's earlier warning to defendant that anything she said could be used against her in court. *Id.*

¶ 39    Finally, we rejected defendant's contention that her inculpatory statements were not made voluntarily. Considering the totality of the circumstances surrounding her statements, we noted that defendant was 28 years old and a high school graduate. *Id.* ¶ 74. We reiterated that defendant was advised of her *Miranda* rights before making her statements and knowingly and intelligently waived those rights. *Id.* We also noted that defendant made her initial inculpatory statement only three hours after voluntarily arriving at the police station and after just a single hour of active questioning. *Id.* ¶ 75. We stressed that defendant was not handcuffed and was given water, cigarettes, and bathroom breaks when needed. *Id.* And we noted that on appeal defendant had abandoned her contention that Detective Landando struck her on the lip. *Id.*

¶ 40      After reviewing the video clips that were introduced at trial, we found no evidence that defendant's statements were the "product of intimidation or offers of leniency." *Id.* ¶ 76. Rather, we noted that the clips "demonstrate that Detective Landando and the sergeant implored defendant to tell the truth about the circumstances surrounding the victim's death," without "gloss[ing] over any details," and that they "reminded [her] that she essentially held the keys to her own destiny because she was the only person that spoke to Hanes prior to and in the aftermath of the victim's death." *Id.*

¶ 41      Citing portions of the interview room video that had not been introduced at the suppression hearing or trial, defendant noted that she eventually recanted her inculpatory statements and argued that her statements were the product of sleep deprivation, anemia, and the cold temperature in the interview room. *Id.* ¶ 77. Although ten DVDs with approximately 48 hours of video footage had been transmitted with the record on appeal, we refused to consider any portion of the video that had not been presented in the trial court. *Id.* We held that such footage was "*de hor* of the trial record" and that any argument based on it was "forfeited and not supported by the record." *Id.* Considering only the evidence properly admitted below, we concluded that the trial court correctly found that defendant's statements were not involuntary. *Id.*

¶ 42                 D. Postconviction Proceedings

¶ 43      In September 2012, defendant filed a *pro se* petition for relief under the Post-Conviction Hearing Act (or Act) (725 ILCS 5/122-1 *et seq.* (West 2012)). The petition alleged, among other things, that defendant's inculpatory statements were involuntary and that she received ineffective assistance of trial counsel in several respects.

¶ 44    In support of her first claim, defendant alleged that detectives "subjected [her] to yelling, cursing, [and] threats that she would take the weight for something she did not do if she did not tell police what they wanted to hear." She claimed that detectives "told [her] that she was not the one they were after but [that she] would get 135 years in prison" and "not see her son anymore" unless she implicated Hanes in the shooting. If she did so, she alleged, detectives told her she would get only five years in prison. She claimed she had been drinking alcohol and smoking marijuana before the detectives picked her up and drove her to the police station for questioning. She further alleged that she "was in interrogation and questioning for 30 to 40 hours," "had little or no sleep," and "was subjected to abusive, intimidating and coercive police conduct." Finally, she claimed that "[o]nce she became aware of the list of her rights on the wall of the interrogation [room], she recanted her confession, stated that her rights had been violated[,] and said she was intimidated into making a false statement."

¶ 45    As for her ineffective assistance claims, defendant challenged her trial counsel's failure to "object[ ] to the trial court viewing only a couple minutes of the 48 hour videotaped interrogation." She further alleged that counsel was ineffective for "failing to call witnesses who could have testified to [her] state of mind and sobriety at the time she was picked up by police and questioned." In particular, she alleged that Donna Lumpkin "could have testified that [defendant] was in fact intoxicated and hysterical at the police station." She also alleged that counsel was ineffective for failing to interview or call David Hanes and Kidonne Smith, who would have allegedly testified "that they had no connection to [defendant]," and Janice Long and Nicole Childs, who would have allegedly testified about a street fight that was taking place near defendant's residence at the time

Walker left her house. Finally, defendant alleged that counsel was ineffective for failing to produce phone records that would allegedly show that she and Hanes did not call each other.

¶ 46      When the trial court failed to rule on the *pro se* petition within 90 days of its docketing, it advanced to second-stage proceedings under the Act, including the appointment of postconviction counsel. See 725 ILCS 5/122-2.1 (West 2012). At several subsequent status hearings, appointed counsel informed the court that he had contacted defendant, reviewed the record, and was conducting an investigation. Counsel reported that defendant sent him two affidavits and that he was investigating their contentions. Counsel later indicated that he had interviewed both of those witnesses. Counsel also informed the court that he made efforts to locate trial counsel's file but determined that the file had been destroyed.

¶ 47      Counsel ultimately informed the court that he had "looked through the record, *** looked through all of the exhibits, [and] looked through the transcript," and had decided not to file an amended petition. On the same date, counsel filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013), attesting that he had "communicated with [defendant] by letter and by phone to ascertain her claims of a deprivation of her constitutional rights," had "examined [the] transcript of her hearing and sentencing," and had decided not to file a supplemental petition because the *pro se* petition "adequately presents [defendant's] issues."

¶ 48      Although counsel did not file an amended petition, he submitted three affidavits in support of defendant's *pro se* petition, including the two affidavits that defendant previously sent him. In the affidavits, Rita Howell (defendant's mother), Maurice Blandin, and Toni-Marie Gipson indicate that defendant was intoxicated on drugs and alcohol when detectives picked her up and drove her to the police station for questioning. Howell stated that defendant came to her bedroom

on March 13, 2006, around 11 p.m. According to Howell, defendant smelled "of marijuana and alcohol," was "hysterical," and "spoke very incoherently" about her boyfriend having been killed. Defendant then received a phone call from a detective named Mike. Later, around 1 a.m. to 2 a.m., two detectives arrived to pick up defendant. According to Howell, Gipson was also present and walked to the detectives' vehicle with defendant, but the detectives told her that her presence at the station was not needed.

¶ 49 Blandin stated that defendant came to his house around noon on March 12, 2006. She was "very upset, crying[,] and intoxicated." She told Blandin that her new boyfriend had just been killed. On March 13, 2006, defendant and Blandin were "getting high and drinking when [defendant's] friend called her" and said that "the police had somebody in custody and wanted her to identify that person." Finally, Gipson stated that she and defendant "were getting intoxicated on alcohol and drugs" on March 14, 2006, when two detectives arrived at defendant's mother's house between 2 a.m. and 4 a.m. The detectives told Gipson that she "did not need to go with [defendant] and that they would bring [defendant] right back."

¶ 50 After appointed counsel filed his Rule 651(c) certificate, defendant filed a *pro se* motion for appointment of new counsel. Defendant alleged that counsel violated Rule 651(c) and rendered unreasonable assistance by failing to investigate her claims, interview witnesses, and amend her *pro se* petition to adequately present her claims. Defendant later filed an amended *pro se* motion for appointment of new counsel. In that motion, defendant alleged that counsel had refused her requests to interview witnesses and amend her *pro se* petition. She alleged that counsel failed to contact and obtain affidavits from witnesses named in her *pro se* petition, failed to obtain her phone

records, failed to make necessary amendments to her *pro se* petition, and failed to remove claims that were procedurally barred or waived.

¶ 51    The State filed a motion to dismiss defendant's postconviction petition. The State argued that defendant's involuntary confession claim was barred by *res judicata* because it was raised and rejected on direct appeal. With respect to defendant's ineffective assistance claims, the State argued that her challenge to trial counsel's failure to object to the court viewing only limited portions of the interview room video was forfeited because it could have been raised on direct appeal. The State further argued that defendant's claims that trial counsel was ineffective for failing to call certain witnesses and produce phone records should be dismissed because they were not supported by affidavits or other evidence. Finally, the State argued that defendant's ineffective assistance claims also failed on the merits because defendant could not show that counsel's performance was deficient or that she was prejudiced as a result.

¶ 52    At the hearing on the State's motion, defendant's postconviction counsel disputed the State's contention that defendant's ineffective assistance claims lacked evidentiary support. In particular, counsel noted that defendant had submitted affidavits from Howell and Gipson (he did not mention the affidavit from Blandin) concerning defendant's alleged intoxication at the time of her custodial statements.

¶ 53    After taking the matter under advisement, the trial court entered a written opinion dismissing defendant's petition. The court held that defendant's involuntary confession claim was barred by *res judicata* because it was previously raised and rejected on direct appeal. The court further held that defendant's ineffective assistance claims were waived because they could have

been, but were not, raised on direct appeal. Alternatively, the court concluded that defendant's ineffective assistance claims were meritless.

¶ 54     The court held that defendant could not show that trial counsel's failure to object to the admission of only a small portion of the interview room video was deficient or prejudicial. In light of our conclusion on direct appeal that defendant's statements were voluntary, the court held, any objection by counsel "would have been without merit and overruled." With respect to defendant's claim that trial counsel was ineffective for failing to call witnesses to testify about her intoxication prior to her interview with police, the court concluded that defendant could not show prejudice. The court noted that video clips of defendant's statements were played at the suppression hearing and at trial, allowing the trial court "to evaluate for itself [defendant's] state of mind and level of sobriety."

¶ 55     The court likewise held that defendant had not shown prejudice from counsel's failure to call Hanes, Smith, Long, or Childs. Although defendant alleged that Hanes and Smith would have testified "that they had no connection to [defendant]," the court noted that such testimony from Hanes would have contradicted defendant's recorded admissions (which she did not retract at the suppression hearing) that Hanes was her former boyfriend and that she had called him after Walker left her house. The court further observed that defendant "fail[ed] to specify how she was prejudiced as a result [of] Hanes and Smith not offering [the proposed] testimony." As for the proposed testimony of Long and Childs regarding the nearby street fight, the court likewise found that defendant failed to explain how the failure to introduce that testimony prejudiced her. Finally, the court noted that defendant's claim that trial counsel should have introduced phone records

showing that she and Hanes did not call each other contradicted her own admission that she called Hanes after Walker left her house.

¶ 56    In an oral ruling made the same day, the trial court denied defendant's *pro se* requests to appoint new postconviction counsel, finding no support for her contention that appointed counsel failed to provide a reasonable level of assistance. Defendant then filed a timely notice of appeal.

¶ 57                                II. ANALYSIS

¶ 58    On appeal, defendant contends that the trial court erred in dismissing her postconviction petition without an evidentiary hearing because it made substantial showings that her inculpatory statements were involuntary and that her trial counsel was ineffective for failing to present additional portions of the interview room video to bolster the defense theory that defendant's statements were involuntary and unreliable. Defendant also argues that her postconviction counsel did not properly certify that he examined the trial record in accordance with Illinois Supreme Court Rule 651(c) and that he provided unreasonable assistance by failing to amend defendant's *pro se* petition and submit additional evidentiary support for her claims.[2]

¶ 59    The Post-Conviction Hearing Act "provides a method by which persons under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Johnson*, 2017 IL 120310, ¶ 14. Proceedings under the Act advance in three stages. *Id.* At the first stage, the circuit court reviews a petition to determine if it is frivolous or patently without merit. *People v.*

---

[2]In her opening brief, defendant also argued that the trial court erred in denying her requests to appoint new postconviction counsel without first conducting an inquiry into her allegations concerning counsel's alleged deficiencies, akin to the type of inquiry mandated by *People v. Krankel*, 102 Ill. 2d 181 (1984), when a defendant makes a posttrial challenge to his trial counsel's effectiveness. In her reply brief, however, defendant concedes that the Illinois Supreme Court recently declined to extend the *Krankel* procedure to postconviction proceedings. See *People v. Custer*, 2019 IL 123339, ¶ 46.

*Allen*, 2015 IL 113135, ¶ 21. If the petition is not dismissed at that stage, it is docketed for further consideration. *Id.*

¶ 60    At the second stage, the court may appoint counsel to represent the defendant and appointed counsel may file an amended petition. *People v. Lesley*, 2018 IL 122100, ¶ 32. The State may then move to dismiss the petition or answer it. *People v. Cotto*, 2016 IL 119006, ¶ 27. If the State moves to dismiss, the court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Bailey*, 2017 IL 121450, ¶ 18. If the court finds that a petition makes the requisite showing, the petition advances to the third stage of proceedings, where the court conducts an evidentiary hearing. *Id.* If a petition does not make a substantial showing of a constitutional violation, it is dismissed. *Id.*

¶ 61    During second-stage review, the court examines only "the legal sufficiency of the petition," without "engag[ing] in any fact-finding or credibility determinations." (Internal quotation marks omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 35. In other words, the court asks "whether the allegations in the petition, liberally construed in favor of the petitioner and taken as true, are sufficient to invoke relief under the Act." *People v. Sanders*, 2016 IL 118123, ¶ 31. Despite this liberal pleading standard, however, the court need not accept as true "facts [that] are positively rebutted by the trial record." *People v. Brown*, 2020 IL App (1st) 170980, ¶ 41; see *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). We review the second-stage dismissal of a postconviction petition *de novo*. *People v. Dupree*, 2018 IL 122307, ¶ 29.

¶ 62                    A. Defendant's Voluntariness Claim is Barred by *Res Judicata*

¶ 63    Defendant first contends that her petition made a substantial showing that her custodial statements were involuntary. Although she acknowledges that we rejected a challenge to the

voluntariness of her statements on direct appeal, she argues that her current claim is not barred by *res judicata* because she has now produced witness affidavits and portions of the interview room video that we did not consider on direct appeal. We disagree.

¶ 64    "A postconviction proceeding is not a substitute for a direct appeal, but rather is a collateral attack on a prior conviction and sentence." *People v. Davis*, 2014 IL 115595, ¶ 13. As such, the "scope of [a postconviction] proceeding is limited to constitutional matters that have not been, nor could have been, previously adjudicated." *People v. Harris*, 224 Ill. 2d 115, 124 (2007). "Any issues that could have been raised on direct appeal, but were not, are procedurally defaulted, and any issues that have previously been decided by a reviewing court are barred by *res judicata*." *Id.* at 124-25.

¶ 65    As outlined above, defendant filed a pretrial motion to suppress her custodial statements. Following an evidentiary hearing, the trial court denied the motion. We affirmed that decision on direct appeal. Reviewing the testimony and video evidence presented at the suppression hearing and trial, we held that "the totality of the circumstances demonstrate[d] that defendant's statement was voluntary." *Woods*, 2011 IL App (1st) 091670-U, ¶ 74. Because defendant's voluntariness claim was raised and rejected on direct appeal, further consideration of the claim on postconviction review is barred by the doctrine of *res judicata*. See *People v. Patterson*, 192 Ill. 2d 93, 139 (2000) (holding that postconviction challenge to voluntariness of confession was "barred by *res judicata*" where, on direct appeal, reviewing court "addressed the voluntariness of defendant's confession and held that the trial court did not err in finding defendant's confession voluntary").

¶ 66    Defendant argues that *res judicata* should not bar consideration of her postconviction claim because her current claim rests on video evidence and witness accounts that were not presented at

the suppression hearing or trial and thus could not have been (and were not) considered on direct appeal. It is true that "the doctrines of *res judicata* and forfeiture are relaxed where fundamental fairness so requires, where the forfeiture stems from the ineffective assistance of appellate counsel, or where the facts relating to the issue do not appear on the face of the original appellate record." *People v. English*, 2013 IL 112890, ¶ 22. But none of those exceptions is satisfied here.

¶ 67    A defendant cannot overcome a *res judicata* bar simply by bolstering a previously rejected claim with additional evidence. Although defendant now supports her voluntariness claim with evidence that was not part of the original appellate record, the basic factual predicate of her claim remains the same. At the suppression hearing, both defendant and two detectives testified about the circumstances surrounding defendant's statements. The State also introduced video evidence showing defendant being advised of, and stating that she understood, her *Miranda* rights. At trial, the State introduced further video evidence showing defendant making several inculpatory statements. In resolving defendant's voluntariness claim on direct appeal, we considered both the suppression hearing testimony and the admitted video evidence and concluded that the totality of the circumstances showed that defendant's statements were voluntary. See *Woods*, 2011 IL App (1st) 091670-U, ¶¶ 74-78.

¶ 68    That defendant now supports her voluntariness claim with additional video evidence and witness affidavits that were not part of the record on direct appeal does not mean that the underlying claim itself "could not have been raised on direct appeal." *People v. Newbolds*, 364 Ill. App. 3d 672, 677 (2006). The cases on which defendant relies do not hold otherwise. For instance, in *Newbolds*, the appellate court declined to find that a postconviction petitioner forfeited his challenge to being forced to wear a stun belt at trial by failing to raise the claim on direct appeal.

*Id.* The court explained that the defendant could not have raised the claim on direct appeal because, while the record showed that the trial court allowed the sheriff to place a stun belt on the defendant, it was "not clear from the record whether the defendant actually did wear a stun belt." *Id.*

¶ 69    Similarly, in *People v. Taylor*, 237 Ill. 2d 356 (2010), our supreme court held that *res judicata* did not bar postconviction review of a defendant's claim that his trial counsel labored under a conflict of interest when he refused to call particular witnesses who would have exonerated the defendant but implicated his codefendant, whom trial counsel also represented, even though the defendant had previously raised a generalized conflict of interest claim on direct appeal. *Id.* at 372-73. The supreme court explained that the more particularized conflict of interest claim raised on postconviction review was not barred by *res judicata* because the evidence on which it was based—affidavits from the potential defense witnesses and others—"was outside of the trial record and, therefore, could not have been considered on direct review." *Id.* at 373.

¶ 70    In both *Taylor* and *Newbolds*, the defendants' postconviction claims depended entirely on evidence that was not part of the trial record. See, *e.g.*, *Taylor*, 237 Ill. 2d at 376 (noting that "the only alleged specific defect in [trial counsel's] representation that defendant attributes to the claimed conflict is that [counsel] failed to call defendant's proffered witnesses"). As such, those claims could not have been raised or considered on direct appeal. In contrast, the coerced confession claim that defendant now seeks to litigate on postconviction review rests on the same factual premise as the voluntariness claim that she raised on direct review—namely, the allegedly coercive circumstances leading to her statements. As she did on direct appeal, defendant now claims that the totality of the circumstances surrounding her custodial statements demonstrate that the statements were involuntary. As explained above, we rejected that claim on direct appeal after

reviewing the testimony and video evidence presented at the suppression hearing and trial. Although defendant now seeks to bolster her claim with additional evidence that she did not present to the trial court—and that we were thus unable to consider on direct appeal—the nature of her underlying claim remains the same. To allow defendant to relitigate her voluntariness claim simply because she has now identified additional evidence in support of it would create "an invitation for defendants to present incomplete claims at trial, sit back, and if they are unsuccessful, raise [a] 'new' fact in a postconviction petition." *People v. Mabrey*, 2016 IL App (1st) 141359, ¶ 40.

¶ 71    Rather, in such circumstances, a defendant must present "substantial *new* evidence" in support of a previously rejected claim in order to relax the doctrine of *res judicata*. (Emphasis added). *Patterson*, 192 Ill. 2d at 139; see also *People v. Wrice*, 2012 IL 111860, ¶¶ 41, 49 (noting State's concession that defendant established cause for raising previously adjudicated claim in successive postconviction petition where defendant relied on "newly discovered evidence substantiat[ing] his prior claim"). New evidence in this context means evidence that has "been discovered since the trial and [is] of such character that it could not have been discovered prior to trial by the exercise of due diligence." (Internal quotation marks omitted.) *Patterson*, 192 Ill. 2d at 139. None of the evidence on which defendant now relies can be characterized as new evidence under this standard.

¶ 72    It is apparent from the trial record that the full interview room video existed and was in defense counsel's possession at the time of the suppression hearing and trial. Likewise, the proposed testimony of Howell, Blandin, and Gipson is not "of such character that it could not have been discovered prior to trial by the exercise of due diligence." (Internal quotation marks omitted.)

*Id.* Those witnesses' affidavits discuss defendant's own alleged actions and physical and emotional state prior to her being transported to the police station for questioning. The affidavits recount facts of which defendant necessarily would have been aware at the time of her suppression hearing and trial. Indeed, defendant herself testified at the suppression hearing that she had been smoking and drinking before receiving a call from the detectives and that she "reek[ed]" of alcohol and marijuana when they picked her up. Defendant likewise would have been aware at the time of the suppression hearing and trial that Howell, Blandin, and Gipson could allegedly corroborate her contentions, as their affidavits indicate that they were present with defendant during the relevant period of time.

¶ 73    Defendant contends that, even if the evidence on which she now relies is not newly discovered, we should relax *res judicata* in the interest of fundamental fairness. But *Patterson* explained that, "in the interests of fundamental fairness, the doctrine of *res judicata* can be relaxed *if* the defendant presents substantial new evidence." (Emphasis added). 192 Ill. 2d at 139. In the absence of newly discovered evidence, we do not think the interests of fundamental fairness require relaxation of *res judicata* here. Those interests are adequately addressed by defendant's ability to argue that her trial counsel rendered ineffective assistance in failing to introduce the evidence on which she now relies. See *Mabrey*, 2016 IL App (1st) 141359, ¶¶ 41-42 (recognizing possibility of ineffective assistance claim where underlying claim is barred by *res judicata*). Defendant has raised such a claim in these proceedings, and we address it on the merits below.[3]

_____

[3]We note that even if we were to relax the doctrine of *res judicata* and reconsider defendant's voluntariness claim in light of the additional evidence she now presents, we would deny relief on the merits. As explained below, defendant has not substantially shown a reasonable probability that her statements would have been suppressed as involuntary if trial counsel had presented the additional evidence. The same reasons that lead us to that conclusion would also lead us to find no substantial showing that defendant's statements were involuntary in light of the totality of the evidence now before us.

¶ 74            B. Defendant's Ineffective Assistance Claim Fails on the Merits

¶ 75    As noted, defendant contends that her trial counsel was ineffective for failing to introduce either at the suppression hearing or at trial witness accounts of her intoxication and additional portions of the interview room video not presented by the State that would have allegedly supported the defense theory that defendant's statements were involuntary and unreliable.

¶ 76    The State initially argues that defendant forfeited this claim by failing to raise it on direct appeal. While "defendants are required to raise ineffective assistance of counsel claims on direct review if apparent on the record," such claims are "better suited to collateral proceedings *** when the record is incomplete or inadequate for resolving the claim" on direct appeal. *People v. Veach*, 2017 IL 120649, ¶ 46. That is the case here. When defendant attempted to rely on direct appeal on the portions of the interview room video on which she now relies, we held that it would be improper to consider that evidence because it had not been presented in the trial court and was thus "*de hor* of the trial record." *Woods*, 2011 IL 091670-U, ¶ 77. Although defendant pointed to the extra-record evidence in support of her voluntariness claim and not an ineffective assistance claim, any attempt to rely on the evidence in support of an ineffective assistance claim would have been met with the same response. The affidavits of Howell, Blandin, and Gipson attesting to defendant's alleged intoxication were likewise absent from the trial record and thus could not have been relied on to support an ineffective assistance claim on direct appeal. For these reasons, defendant's ineffective assistance claim is not forfeited, and we turn to its merits.

¶ 77    Ineffective assistance of counsel claims are judged under a familiar two-part standard. To prevail on such a claim, a defendant must show that her counsel's performance was deficient and that she was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687 (1984);

*People v. Cherry*, 2016 IL 118728, ¶ 24. To demonstrate deficient performance, the defendant "must show that counsel's performance fell below an objective standard of reasonableness." *People v. Dupree*, 2018 IL 122307, ¶ 44. To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* When an ineffective assistance claim is raised in postconviction proceedings, the petition need only make a substantial showing of deficient performance and prejudice to survive second-stage review. See *Domagala*, 2013 IL 113688, ¶ 47. "Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim." *People v. Jackson*, 2020 IL 124112, ¶ 90. "Thus, a reviewing court need not consider whether counsel's performance was deficient before determining whether the defendant was so prejudiced by the alleged deficiencies that he is entitled to a new trial." *People v. Perry*, 224 Ill. 2d 312, 342 (2007).

¶ 78     We start with defendant's contention that there is a reasonable probability her statements would have been suppressed as involuntary if counsel had presented additional portions of the interview room video and witness accounts concerning her alleged intoxication at the time of the interview. "The test for voluntariness is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." (Internal quotation marks omitted.) *People v. Slater*, 228 Ill. 2d 137, 160 (2008). In making this determination, a court should consider the totality of the circumstances surrounding the challenged statements. *Id.* Relevant factors "include [1] the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; [2] the legality and duration of the detention; [3] the

presence of *Miranda* warnings; [4] the duration of the questioning; and [5] any physical or mental abuse by police, including the existence of threats or promises." *People v. Richardson*, 234 Ill. 2d 233, 253-54 (2009). In assessing these factors, a court "may consider evidence adduced at trial as well as at the suppression hearing." *Id.* at 252.

¶ 79    To begin, it is important to recount the testimony and evidence that *was* presented at the suppression hearing and trial and which we *did* consider when rejecting defendant's voluntariness claim on direct appeal. That evidence showed that defendant was 28 years old and a high school graduate. *Woods*, 2011 IL App (1st) 091670-U, ¶ 74. Before making her statements, she was advised of and knowingly and intelligently waived her *Miranda* rights. *Id.* The evidence established that defendant made her initial inculpatory statement approximately three hours after she arrived at the police station and after only one hour of questioning. *Id.* ¶ 75. We observed that, during "her time at the police station, defendant was not handcuffed and was given bathroom breaks, drinks, and cigarettes." *Id.* We further noted that defendant made no contention on appeal that Detective Landando struck her on the lip during questioning, contrary to her testimony at the suppression hearing. *Id.* (Defendant likewise makes no such contention now.)

¶ 80    In addition to the suppression hearing testimony, the video clips presented at both the suppression hearing and trial showed that when waiving her *Miranda* rights and making her incriminating statements, defendant appeared alert, spoke coherently, and did not exhibit signs of confusion, discomfort, or distress, although she did speak softly at times and occasionally appeared to be choking back tears. The clips played at trial also showed that Detective Landando and the unnamed sergeant occasionally raised their voices or made gesticulations with their arms when speaking with defendant. One clip showed the sergeant telling defendant, "I know you feel bad,

and you think you're going to be in trouble," before asking her to "just tell me the truth." Another clip showed the sergeant, standing within one or two feet of defendant, telling her that Hanes was "trying to put [her] in the middle." The sergeant then told defendant, "If you didn't fucking pull the trigger, don't be taking the weight for shit you didn't do," followed by a plea for defendant to "tell me what [Hanes] said."

¶ 81    On direct appeal, we found that these clips did "not reveal that defendant's confession was a product of intimation or offers of leniency." *Woods*, 2011 IL App (1st) 091670-U, ¶ 76. Instead, we explained, the clips "demonstrate that Detective Landando and the sergeant implored defendant to tell the truth about the circumstances surrounding the victim's death," that they "reminded [her] that she essentially held the keys to her own destiny," and that they "were careful to ask defendant not to gloss over any details." *Id.* In light of both the testimony and video evidence presented at the suppression hearing and trial, we concluded that defendant's will had not been overborne and that there was no evidence she made her statements as a result of physical or psychological coercion, distress, or intimidation. *Id.* ¶ 77.

¶ 82    Defendant contends that there is a reasonable probability her statements would have been found involuntary if trial counsel had presented additional portions of the interview room video and witness accounts of her physical condition prior to the interview. She asserts that this additional evidence shows that she was intoxicated, sleep-deprived, and cold during questioning, that she did not understand her rights, and that she eventually recanted her statements and contemporaneously alleged that they resulted from abusive police conduct, threats, and offers of leniency. We have now reviewed the entirety of the interview room video, with particular focus on the portions cited by defendant. We have also considered the affidavits submitted with

defendant's postconviction petition. Having done so, we conclude that defendant has not substantially shown a reasonable probability that her statements would have been suppressed as involuntary if trial counsel had presented the totality of this evidence.

¶ 83    We start with the affidavits of Howell, Blandin, and Gipson, which generally attest that defendant was consuming alcohol and marijuana to the point of intoxication in the hours before detectives picked her up and transported her to the police station for questioning. There is no reasonable probability that such testimony would have altered the trial court's assessment of the voluntariness of defendant's statements. For one thing, defendant herself testified at the suppression hearing that she had been smoking marijuana and drinking alcohol in the hours before she received word from a friend that detectives wanted her to return to the police station. She also testified that, when the detectives picked her up, she smelled of alcohol and marijuana and her intoxication was obvious. Detective Landando denied that assertion, testifying that defendant did not smell of alcohol or appear to be under the influence of drugs when he and Detective Adams picked her up. Moreover, both Detectives Landando and Adams testified that defendant was coherent and did not appear confused during questioning. While testimony from Howell, Blandin, and Gipson would have lent corroboration to defendant's testimony, their testimony would not have overcome the interview room video itself, which showed that defendant was coherent, lucid, and did not exhibit any signs of intoxication when waiving her *Miranda* rights or making her subsequent inculpatory statements.

¶ 84    The video likewise refutes defendant's contention that her statements were induced by sleep deprivation. Rather, the video shows that defendant appeared alert and aware of her situation and surroundings when waiving her *Miranda* rights and making her inculpatory statements. We

note, as we did on direct appeal, that defendant made her initial inculpatory statement to police around 7:30 a.m., just over three hours after arriving at the police station at 4:20 a.m., and after only a single hour of prior questioning from around 4:45 a.m. to 5:45 a.m. Moreover, the additional video evidence that we have now reviewed demonstrates that between the conclusion of the conversation in which she made her initial inculpatory statement (around 8:30 a.m.) and the beginning of the conversation in which she made her second inculpatory statement (around 12:45 p.m.), defendant was mostly left alone in the interview room, without handcuffs, and appeared to fall asleep (or at least rest) for brief intervals, both while sitting upright on the bench and leaning against the wall and while leaning against the wall with her legs stretched across the bench. We do not doubt that defendant had difficulty sleeping in those positions. But the critical point remains that the video evidence documenting her *Miranda* waiver and subsequent inculpatory statements provides no reason to suspect that she was negatively affected by a lack of sleep.

¶ 85    There is likewise no indication in the full record now before us that defendant's will was overborne by coldness in the interview room or anemia. Defendant cites portions of the interview room video showing her wearing a winter coat, or placing the coat over her lap and arms, in the period between her first and second inculpatory statements. She also points to several portions of the video, beginning around 7:30 p.m. on March 14, when she told detectives that she was cold and anemic. We note, however, that defendant waived her *Miranda* rights and made her initial inculpatory statement within minutes of entering the interview room at approximately 7:30 a.m. on March 14—twelve hours *before* she first told detectives that she was cold and anemic. At the time of her initial statement, defendant appears to have had a coat next to her on the bench but was not wearing it or draping it over her body. There is no indication in the video that defendant felt

cold or otherwise uncomfortable during that conversation. And though defendant is later seen draping the coat over her lap while making her second inculpatory statement around 1 p.m. on March 14, that conversation likewise took place well before defendant made any complaint to detectives about the temperature in the interview room. And defendant's demeanor during that conversation similarly gives no indication that she was overcome with discomfort by the temperature in the room or her anemia.

¶ 86    Defendant also points to portions of the interview room video in which she recanted her inculpatory statements and agreed to take a polygraph test. While a defendant's recantation has been considered as one factor among the many to be considered when assessing the voluntariness of an earlier statement, see, *e.g.*, *People v. Bowman*, 335 Ill. App. 3d 1142, 1153-54 (2002); *People v. Savoy*, 82 Ill. App. 3d 767, 775 (1980), the particular circumstances of defendant's recantation and agreement to take a polygraph test do not call the voluntariness of her inculpatory statements into question.

¶ 87    Unlike the defendant in *Savoy*, the defendant here did not recant her inculpatory statements "shortly after they were made." 82 Ill. App. 3d at 775. As discussed, defendant made her first inculpatory statement around 7:30 a.m. and a second statement around 1 p.m. Yet she did not begin to recant those statements until around 7:30 p.m.—twelve hours after the first statement and more than six hours after the second. And the exchange with Detective Landando in which she agreed to take a polygraph test occurred even later, around 1:30 p.m. the following day. In light of the totality of the circumstances, we do not think evidence of this belated recantation—and even more belated agreement to take a polygraph test—could reasonably support a finding that defendant's earlier statements were involuntary.

¶ 88    *Bowman* is similarly unhelpful for defendant. There, the court found that the defendant had been tricked into confessing by a cellmate who, in secret collaboration with a detective, told the defendant that he would help him escape but that he would have to confess in order to effectuate the plan. 335 Ill. App. 3d at 1146-49, 1153-54. In addition to describing the details of the scheme to extract the defendant's statements, the court noted that the defendant "recanted his prior statements" after he "realized that he had been tricked." *Id*. at 1154. "Based on the totality of the circumstances, [the court] conclude[d] that defendant's confession was the result of deceptive interrogation tactics calculated to overcome [his] free will." *Id.* The facts here are far different. There is no evidence that defendant's inculpatory statements were extracted through trickery or deceit by the detectives. (And as we discuss below, there is likewise no evidence that detectives induced defendant's statements through threats or promises of leniency.) While the recantation in *Bowman* lent weight to the defendant's contention that his statements were the product of trickery and not his free will, defendant's recantation here—well after making two inculpatory statements hours apart from each other—suggests not that her earlier statements were involuntary, but that she eventually came to have second thoughts about the wisdom of making them.

¶ 89    Defendant likewise identifies portions of the interview room video in which she alleged that detectives had violated her rights and coerced her earlier statements. In particular, she points to a portion of the video where she appears to have read a poster on the wall of the interview room with a list of the *Miranda* rights, after which she told detectives that they had violated her rights by badgering her and telling her that she would get 135 years in prison if she did not confess. She contends that this evidence demonstrates that she did not truly understand her *Miranda* rights when she previously waived them. We note, however, that this sequence of events did not begin until

around 10 a.m. on March 15—more than 24 hours after defendant was advised of and waived her *Miranda* rights and made her initial inculpatory statement.

¶ 90 Defendant's assertions that she did not understand her rights and was threatened into confessing are not new. She testified at the suppression hearing that, before placing her in the interview room, detectives showed her an envelope with "20 to 120" written on it and told her that she would get that much time in prison unless she cooperated and implicated Hanes, in which case she would get only five years in prison. She also testified that she did not actually understand her rights until several hours after she had already waived them and made her incriminating statements, when she read the form posted on the interview room wall. On direct appeal, having considered the suppression hearing testimony as well as the video clips of defendant being advised of her *Miranda* rights and making her incriminating statements, we concluded that defendant's *Miranda* waiver was knowing and intelligent and that her subsequent statements were voluntary. Nothing in the additional video evidence we have now reviewed—including those portions showing her reading her rights on the wall and subsequently complaining to detectives that her rights had been violated—undermines our prior conclusions.

¶ 91 Finally, defendant contends, as she did on direct appeal, that her inculpatory statements were extracted through intimidation, threats, and offers of leniency. She cites portions of the interview room video that were introduced at trial, in which Detective Landando and the unnamed sergeant accused her of lying about Hanes threatening her son. She notes that the pair raised their voices, swore, made gesticulations with their arms, and (in the sergeant's case) occasionally stood very close to her as she was seated on the bench. She argues that the sergeant implied that she would not get in trouble if she confessed when he told her, "I know you feel bad, and you think

you're going to be in trouble," before asking her to "just tell me the truth." She asserts that the sergeant conveyed a similar message when he said, "If you didn't fucking pull the trigger, don't be taking the weight for shit you didn't do."

¶ 92 Defendant also cites additional snippets of video from the same conversation that were not introduced at trial, in which Detective Landando and the sergeant made similar comments, such as telling defendant that she should not be scared because she was not the shooter and that they were more interested in that person than her. Defendant contends that these comments amounted to a threat that she would be held responsible for Walker's murder if she did not cooperate and an improper promise that she would receive leniency if she confessed her role and named the actual shooter.

¶ 93 It has "long [been] recognized that offers of leniency are a factor to be considered in determining whether a statement is voluntary." *People v. Ruegger*, 32 Ill. App. 3d 765, 769 (1975). But "[t]o constitute a promise of leniency, the statement must be coupled with a suggestion of a specific benefit that will follow if [the] defendant confesses." (Internal quotation marks omitted.) *People v. Lee*, 2012 IL App (1st) 101851, ¶ 34. In context, the detectives' comments here cannot be construed as offers of leniency. While the detectives told defendant that she should not be scared if she was not the shooter and that she should not take the weight for the shooting if she did not pull the trigger, they never suggested that "a specific benefit" would "follow if [she] confesse[d]." (Internal quotation marks omitted.) *Id.* Instead, the detectives repeatedly urged defendant to tell them the truth about what happened and about what Hanes had said to her without "sugarcoat[ing]" things. See *People v. Wipfler*, 68 Ill. 2d 158, 173 (1977) (mere exhortations to tell the truth are permissible absent any suggestion that a specific benefit will follow). As we observed on direct

appeal, the detectives "implored defendant to tell the truth about the circumstances surrounding the victim's death" and "reminded [her] that she essentially held the keys to her own destiny." *Woods*, 2011 IL App (1st) 091670-U, ¶ 76. Although defendant now identifies additional statements by the detectives that we were unable to consider on direct appeal, our review of those statements and the interview room video as a whole does not alter our previous conclusion that "defendant's confession was [not] a product of intimidation or offers of leniency." *Id.* Indeed, it is important to remember that defendant's first inculpatory statement—in which she admitted that she lured Walker to her house, at Hanes's direction, after Hanes told her that he wanted to kill Walker, and that she then called Hanes shortly after Walker left and informed him of that fact— was made well before the detectives made the comments that defendant now contends were offers of leniency that induced her confession.

¶ 94    For all these reasons, we conclude that defendant has not made a substantial showing that it is reasonably probable that her custodial statements would have been suppressed as involuntary if trial counsel had presented additional portions of the interview room video and testimony concerning her alleged intoxication at the time of the interview. We likewise find no substantial showing that introduction of this evidence at trial would have made it reasonably probable that defendant would have been acquitted. For the same reasons supporting our conclusion that the evidence is not reasonably likely to have altered the trial court's assessment of the voluntariness of her statements, we think it equally improbable that the evidence would have caused the court to discount defendant's statements as unreliable or incredible. We thus conclude that the trial court properly dismissed both aspects of this ineffective assistance claim without an evidentiary hearing.

¶ 95          C. Postconviction Counsel Did Not Render Unreasonable Assistance

¶ 96    Defendant's final claim is that her appointed postconviction counsel failed to properly certify his compliance with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013) and rendered unreasonable assistance by failing to amend her *pro se* petition and submit additional evidentiary support for her claims. She asks us to remand for compliance with Rule 651(c) or for the appointment of new postconviction counsel. We decline both requests.

¶ 97    "[I]t is settled that there is no constitutional right to assistance of counsel during postconviction proceedings." *People v. Cotto*, 2016 IL 119006, ¶ 29. And because "[t]he right to assistance of counsel in postconviction proceedings is a matter of legislative grace, *** a defendant is guaranteed only the level of assistance provided by the Post-Conviction Hearing Act." (Internal quotation marks.) *Id.* "The required quantum of assistance has been judicially deemed to be a 'reasonable level,' a standard that is significantly lower than the one mandated at trial by our state and federal constitutions." *People v. Custer*, 2019 IL 123339, ¶ 30.

¶ 98    "Commensurate with the lower reasonable assistance standard mandated in postconviction proceedings," Rule 651(c) "sharply limits the requisite duties of postconviction counsel." *Id.* ¶ 32. Postconviction counsel need only certify that he "has consulted with petitioner by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013); see *Custer*, 2019 IL 123339, ¶ 32. "Rule 651(c) imposes [these] specific duties on postconviction counsel to ensure that counsel provides [the required] reasonable level of assistance." *People v. Kirk*, 2012 IL App (1st) 101606, ¶ 18.

¶ 99    By filing a certificate under Rule 651(c), postconviction counsel "create[s] a rebuttable presumption that reasonable assistance was provided." *Custer*, 2019 IL 123339, ¶ 32. "It is defendant's burden to overcome this presumption by demonstrating his attorney's failure to substantially comply with the duties mandated by Rule 651(c)." *People v. Profit*, 2012 IL App (1st) 101307, ¶ 19. "In the absence of such a certificate," however, "a clear and affirmative showing of compliance on the record must be present." (Internal quotation marks omitted.) *People v. Smith*, 2016 IL App (4th) 140085, ¶ 33.

¶ 100   Defendant contends that the Rule 651(c) certificate filed by her postconviction counsel is invalid because it does not certify that counsel "examined the record of the proceedings at the trial." Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013). As defendant notes, counsel instead certified that he "examined [the] transcript of her hearing and sentencing." In this case at least, this amounts to a distinction without a difference. Because defendant's suppression hearing and trial were conducted on the same day (with only closing argument and the judge's verdict coming on later dates), and because much of the testimony from the suppression hearing was introduced at trial by way of stipulation, we think postconviction counsel's certification that he "examined [the] transcript of [defendant's] hearing" is sufficient to establish that he "examined the record of the proceedings at the trial," as Rule 651(c) requires.

¶ 101   Even if counsel's certificate alone were insufficient to establish his compliance with Rule 651(c)'s mandate to "examine[ ] the record of the proceedings at the trial," his comments in court upon the filing of the certificate make "a clear and affirmative showing of compliance." (Internal quotation marks omitted.) *Smith*, 2016 IL App (4th) 140085, ¶ 33. When filing the certificate, counsel informed the court that he had "looked through the record, *** looked through all of the

exhibits, [and] looked through the transcript." This more fulsome recitation of counsel's actions, made contemporaneously with the filing of his certificate, leaves no doubt that counsel complied with Rule 651(c)'s requirement to "examine[ ] the record of the proceedings at the trial." Accordingly, we conclude that counsel adequately certified compliance with Rule 651(c)'s requirements, creating a rebuttable presumption that he rendered reasonable assistance.

¶ 102    We further conclude that defendant has failed to rebut that presumption. First, counsel's failure to amend defendant's *pro se* petition to add claims arising from the affidavits of Howell, Blandin, and Gipson does not reflect unreasonable assistance. In their affidavits, those witnesses discussed defendant's alleged intoxication prior to her questioning by police. Although defendant's *pro se* petition specifically mentioned Donna Lumpkin as a witness who could have provided such testimony, her petition alleged more broadly that trial counsel was ineffective for "failing to call *witnesses* who could have testified to [her] state of mind and sobriety at the time she was picked up by police and questioned." (Emphasis added.) Accordingly, there was no need for counsel to amend defendant's *pro se* petition to raise a claim related to these affidavits. Instead, it was proper for counsel to argue, as he did in response to the State's motion to dismiss, that the affidavits provided evidentiary support for the claim already included in defendant's petition.

¶ 103    Nor does the record demonstrate that counsel's failure to submit affidavits from the five potential witnesses named in defendant's *pro se* petition resulted from a failure to investigate such witnesses. Counsel informed the trial court on multiple occasions that he was investigating defendant's contentions. Although he only specifically mentioned interviewing two potential witnesses, that alone does not rebut the presumption that counsel provided reasonable assistance. On the record before us, defendant has not shown that counsel failed to adequately investigate her

other proposed witnesses. Instead, based on counsel's Rule 651(c) certificate and comments in court, we must presume that counsel attempted to investigate defendant's witnesses and substantiate her claims but that his investigation ultimately bore no fruit.

¶ 104 Finally, defendant has not shown that counsel's failure to submit an affidavit from defendant herself amounted to unreasonable assistance. Defendant asserts that her own affidavit was necessary for a proper presentation of her claims because only she could explain her subjective perceptions and mental and physical condition during her police interview and describe what she told trial counsel about her proposed witnesses and whether counsel adequately investigated them. But defendant testified about the circumstances surrounding her custodial statements, including the detectives' alleged coercion and her alleged intoxication, under oath at the suppression hearing, and she reiterated and added detail to that account in her postconviction petition, which she verified under penalty of perjury. Defendant also discussed the substance of her proposed witnesses' testimony in her postconviction petition and alleged that counsel failed to adequately investigate or interview them. Defendant does not explain why it was necessary for her to repeat any of those allegations in a separate affidavit. Moreover, we note that our rejection of defendant's coerced confession claim and related ineffective assistance claim was not based on the absence of an affidavit from defendant. Likewise, the trial court's rejection of defendant's additional ineffective assistance claims (which defendant does not substantively contest on appeal) did not rest on the lack of an affidavit from defendant but instead on defendant's failure to show how she was prejudiced by counsel's failure to introduce the testimony described in her petition. For all these reasons, we conclude that defendant has not established that postconviction counsel provided unreasonable assistance.

¶ 105                                    III. CONCLUSION

¶ 106   For the foregoing reasons, we affirm the circuit court's judgment dismissing defendant's

petition for postconviction relief.

¶ 107   Affirmed.

No. 1-16-2751

| Cite as: | *People v. Woods*, 2020 IL App (1st) 162751 |
| --- | --- |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 06-CR-9243; the Hon. Erica L. Reddick, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Christopher L. Gehrke, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, and John E. Nowak, Assistant State's Attorneys, of counsel), for the People. |